# ALLEN v. WRIGHT ET AL.

No. 81–757.  Argued February 29, 1984—Decided July 3, 1984*

---

*Together with No. 81–970, *Regan, Secretary of the Treasury, et al.* v. *Wright et al.*, also on certiorari to the same court.

738

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, *post*, p. 766. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 783. MARSHALL, J., took no part in the decision of the cases.

*Solicitor General Lee* argued the cause for petitioners in No. 81–970. With him on the briefs were *Assistant Attorney General Archer, Deputy Solicitor General Wallace, Ernest J. Brown,* and *Robert S. Pomerance. William J. Landers II* argued the cause for petitioner in No. 81–757. With him on the brief was *S. Shepherd Tate.*

*Robert H. Kapp* argued the cause for respondents. With him on the brief were *Joseph M. Hassett, David S. Tatel, William L. Robinson, Norman J. Chachkin,* and *Frank R. Parker.*†

JUSTICE O'CONNOR delivered the opinion of the Court.

Parents of black public school children allege in this nationwide class action that the Internal Revenue Service (IRS) has not adopted sufficient standards and procedures to fulfill its obligation to deny tax-exempt status to racially discriminatory private schools. They assert that the IRS thereby harms them directly and interferes with the ability of their

---

†*Wilfred R. Caron* and *Angelo Aiosa* filed a brief for the United States Catholic Conference as *amicus curiae* urging reversal.

*Thomas I. Atkins* and *Harold Flannery* filed a brief for the National Association for the Advancement of Colored People et al. as *amici curiae* urging affirmance.

children to receive an education in desegregated public schools. The issue before us is whether plaintiffs have standing to bring this suit. We hold that they do not.

I

The IRS denies tax-exempt status under §§ 501(a) and (c)(3) of the Internal Revenue Code, 26 U. S. C. §§ 501(a) and (c)(3)—and hence eligibility to receive charitable contributions deductible from income taxes under §§ 170(a)(1) and (c)(2) of the Code, 26 U. S. C. §§ 170(a)(1) and (c)(2)—to racially discriminatory private schools. Rev. Rul. 71–447, 1971–2 Cum. Bull. 230.[1] The IRS policy requires that a school applying for tax-exempt status show that it "admits the students of any race to all the rights, privileges, programs, and activities generally accorded or made available to students at that school and that the school does not discriminate on the basis of race in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs." *Ibid.* To carry out this policy, the IRS has established guidelines and procedures for determining whether a particular school is in fact racially nondiscriminatory. Rev. Proc. 75–50, 1975–2 Cum. Bull. 587.[2] Failure to comply with the guidelines "will ordinarily result in the proposed revocation of" tax-exempt status. *Id.*, § 4.08, p. 589.

---

[1] As the Court explained last Term in *Bob Jones University* v. *United States*, 461 U. S. 574, 579 (1983), the IRS announced this policy in 1970 and formally adopted it in 1971. Rev. Rul. 71–447, 1971–2 Cum. Bull. 230. This change in prior policy was prompted by litigation over tax exemptions for racially discriminatory private schools in the State of Mississippi, litigation that resulted in the entry of an injunction against the IRS largely if not entirely coextensive with the position the IRS had voluntarily adopted. *Green* v. *Kennedy*, 309 F. Supp. 1127 (DC) (entering preliminary injunction), appeal dism'd *sub nom. Cannon* v. *Green*, 398 U. S. 956 (1970); *Green* v. *Connally*, 330 F. Supp. 1150 (DC) (entering permanent injunction), summarily aff'd *sub nom. Coit* v. *Green*, 404 U. S. 997 (1971).

[2] The 1975 guidelines replaced guidelines issued for the same purpose in 1972. Rev. Proc. 72–54, 1972–2 Cum. Bull. 834.

The guidelines provide that "[a] school must show affirmatively both that it has adopted a racially nondiscriminatory policy as to students that is made known to the general public and that since the adoption of that policy it has operated in a bona fide manner in accordance therewith." *Id.*, § 2.02.[3] The school must state its nondiscrimination policy in its organizational charter, *id.*, § 4.01, pp. 587–588, and in all of its brochures, catalogs, and other advertisements to prospective students, *id.*, § 4.02, p. 588. The school must make its nondiscrimination policy known to the entire community served by the school and must publicly disavow any contrary representations made on its behalf once it becomes aware of them. *Id.*, § 4.03.[4] The school must have nondiscrimina-

---

[3] The definition of "racially nondiscriminatory policy" is qualified in one respect: "A policy of a school that favors racial minority groups with respect to admissions, facilities and programs, and financial assistance will not constitute discrimination on the basis of race when the purpose and effect is to promote the establishment and maintenance of that school's racially nondiscriminatory policy as to students." Rev. Proc. 75–50, § 3.02, 1975–2 Cum. Bull. 587.

[4] One way a school can satisfy the publication requirement is to disseminate notice of the nondiscrimination policy through the print or broadcast media. *Id.*, § 4.03–1, p. 588. Detailed IRS rules govern what print and broadcast media may be selected as well as the content of the notice. *Ibid.* Although the IRS encourages all schools to follow that route, see *id.*, § 4.03–2, p. 589, there are three alternative ways to satisfy the publication requirement.

First, a parochial or church-related school at least 75% of whose students in the preceding three years were members of the church satisfies the requirement if it gives notice of its nondiscrimination policy in church publications, unless it advertises in newspapers of general circulation. *Id.*, § 4.03–2(a), p. 588. Second, a school that draws its students from areas larger than the local community satisfies the requirement if it enrolls minority students in meaningful numbers or engages in promotional and recruitment activities reasonably designed to reach all racial segments of the areas from which students are drawn. *Id.*, § 4.03–2(b). Third, a school serving only a local community satisfies the publication requirement if it actually enrolls minority students in meaningful numbers. *Id.*, § 4.03–2(c), pp. 588–589. A school choosing any of these three options

tory policies concerning all programs and facilities, *id.*, § 4.04, p. 589, including scholarships and loans, *id.*, § 4.05,[5] and the school must annually certify, under penalty of perjury, compliance with these requirements, *id.*, § 4.07.[6]

The IRS rules require a school applying for tax-exempt status to give a breakdown along racial lines of its student body and its faculty and administrative staff, *id.*, § 5.01–1, as well as of scholarships and loans awarded, *id.*, § 5.01–2. They also require the applicant school to state the year of its organization, *id.*, § 5.01–5, and to list "incorporators, founders, board members, and donors of land or buildings," *id.*, § 5.01–3, and state whether any of the organizations among these have an objective of maintaining segregated public or private school education, *id.*, § 5.01–4. The rules further provide that, once given an exemption, a school must keep specified records to document the extent of compliance with the IRS guidelines. *Id.*, § 7, p. 590.[7] Finally, the

---

"must be prepared to demonstrate" on audit that this choice was justified. *Id.*, § 4.03–2, p. 589.

[5] Scholarships and loans must generally be available without regard to race, and this fact must be known in the community served by the school. An exception is made, however, consistent with § 3.02 of Rev. Proc. 75–50, 1975–2 Cum. Bull. 587, see n. 3, *supra*, for financial assistance programs favoring minority students that are designed to promote the school's non-discriminatory policy. A second exception is made for financial assistance programs "favoring members of one or more racial groups that do not significantly derogate from the school's racially nondiscriminatory policy . . . ." Rev. Proc. 75–50, § 4.05, 1975–2 Cum. Bull. 589.

[6] The regulations also declare that discrimination in the employment of faculty and administrative staff (or its absence) is indicative of discrimination with respect to students (or its absence). *Id.*, § 4.07.

[7] Records must be kept, and preserved for three years, concerning the racial composition of the student body, the faculty and administrative staff, and the group of students receiving financial assistance. Copies of brochures, catalogs, and advertising must also be kept. *Id.*, § 7.01, p. 590. Although the method of figuring racial composition must be described in the records compiled by the school, the school need not require students, applicants, or staff to furnish information not otherwise required, and the school generally need not release personally identifiable records. *Id.*,

rules announce that any information concerning discrimination at a tax-exempt school is officially welcomed. *Id.*, § 6.[8]

In 1976 respondents challenged these guidelines and procedures in a suit filed in Federal District Court against the Secretary of the Treasury and the Commissioner of Internal Revenue.[9] The plaintiffs named in the complaint are parents of black children who, at the time the complaint was filed, were attending public schools in seven States in school districts undergoing desegregation. They brought this nationwide class action "on behalf of themselves and their children, and . . . on behalf of all other parents of black children attending public school systems undergoing, or which may in the future undergo, desegregation pursuant to court order [or] HEW regulations and guidelines, under state law, or voluntarily." App. 22–23. They estimated that the class they seek to represent includes several million persons. *Id.*, at 23.

Respondents allege in their complaint that many racially segregated private schools were created or expanded in their

---

§ 7.02. Cf. *id.*, § 5.02, pp. 589–590 (information furnished by applicant for tax-exempt status subject to similar qualifications). Reports containing the required information, if filed in accordance with law with a Government agency, may satisfy the recordkeeping requirement if the information is current and the school maintains copies of the reports. *Id.*, § 7.03, p. 590. Failure to maintain the required records gives rise to a presumption of noncompliance with the guidelines. *Id.*, § 7.04.

[8] The Revenue Procedure expressly notes, *id.*, § 8, that its provisions are superseded by, to the extent they differ from, the injunction concerning Mississippi schools issued in *Green* v. *Connally*, 330 F. Supp. 1150 (DC), summarily aff'd *sub nom. Coit* v. *Green*, 404 U. S. 997 (1971).

[9] Shortly before respondents filed this action, the plaintiffs in the *Green* litigation, concerning the tax-exempt status of private schools in Mississippi, *ibid.*, moved to reopen that suit, making allegations comparable to those in respondents' complaint. See *Wright* v. *Regan*, 211 U. S. App. D. C. 231, 236, 656 F. 2d 820, 825 (1981). In 1977, the Mississippi litigation was consolidated with this suit. *Ibid.* The *Green* litigation was not consolidated with this lawsuit on appeal, however, and it is not before this Court.

communities at the time the public schools were undergoing desegregation. *Id.*, at 23–24. According to the complaint, many such private schools, including 17 schools or school systems identified by name in the complaint (perhaps some 30 schools in all), receive tax exemptions either directly or through the tax-exempt status of "umbrella" organizations that operate or support the schools. *Id.*, at 23–38.[10] Respondents allege that, despite the IRS policy of denying tax-exempt status to racially discriminatory private schools and despite the IRS guidelines and procedures for implementing that policy, some of the tax-exempt racially segregated private schools created or expanded in desegregating districts in fact have racially discriminatory policies. *Id.*, at 17–18 (IRS permits "schools to receive tax exemptions merely on the basis of adopting and certifying—but not implementing—a policy of nondiscrimination"); *id.*, at 25 (same).[11] Respond-

---

[10] Hereafter, references to a private school's tax exemption embrace both tax-exempt status of the school and tax-exempt status of an "umbrella" organization. We assume, without deciding, that a grant of tax-exempt status to an "umbrella" organization of the sort respondents have in mind is subject to the same legal constraints as a grant of tax-exempt status directly to a school.

[11] The complaint generally uses the phrase "racially segregated school" to mean simply that no or few minority students attend the school, irrespective of the school's maintenance of racially discriminatory policies or practices. Although the complaint, on its face, alleges that granting tax-exempt status to any "racially segregated" school in a desegregating public school district is unlawful, App. 39, it is clear that respondents premise their allegation of illegality on discrimination, not on segregation alone.

The nub of respondents' complaint is that current IRS guidelines and procedures are inadequate to detect false certifications of nondiscrimination policies. See *id.*, at 17–18, 25. This allegation would be superfluous if respondents were claiming that racial segregation even without racial discrimination made the grant of tax-exempt status unlawful. Moreover, respondents have noticeably refrained from asserting that the IRS violates the law when it grants a tax exemption to a nondiscriminatory private school that happens to have few minority students. Indeed, respondents' brief in this Court makes a point of noting that their complaint alleges not only segregation but discrimination, see Brief for Respondents 10, n. 8,

ents allege that the IRS grant of tax exemptions to such racially discriminatory schools is unlawful.[12]

Respondents allege that the challenged Government conduct harms them in two ways. The challenged conduct

> "(a) constitutes tangible federal financial aid and other support for racially segregated educational institutions, and
>
> "(b) fosters and encourages the organization, operation and expansion of institutions providing racially segregated educational opportunities for white children avoiding attendance in desegregating public school districts and thereby interferes with the efforts of federal courts, HEW and local school authorities to desegregate public school districts which have been operating racially dual school systems." *Id.*, at 38–39.

---

and it repeatedly states that the challenged Government conduct is the granting of tax exemptions to racially discriminatory private schools, see, *e. g., id.*, at 9–10 ("Respondents alleged that the federal petitioners are continuing to grant tax-exempt status to racially discriminatory private schools . . ."); *id.*, at 13–14.

Since respondents' entire argument is built on the assertion that their rights are violated by IRS grants of tax-exempt status to some number of unidentified racially discriminatory private schools in desegregating districts, we resolve the ambiguity in respondents' complaint by reading it as making that assertion.

Contrary to JUSTICE BRENNAN's statement, *post*, at 768, the complaint does not allege that each desegregating district in which they reside contains one or more racially discriminatory private schools unlawfully receiving a tax exemption.

[12] The complaint alleges that the challenged IRS conduct violates several laws: § 501(c)(3) of the Internal Revenue Code, 26 U. S. C. § 501(c)(3); Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U. S. C. § 2000d *et seq.;* Rev. Stat. § 1977, 42 U. S. C. § 1981; and the Fifth and Fourteenth Amendments to the United States Constitution.

Last Term, in *Bob Jones University* v. *United States*, 461 U. S. 574 (1983), the Court concluded that racially discriminatory private schools do not qualify for a tax exemption under § 501(c)(3) of the Internal Revenue Code.

Thus, respondents do not allege that their children have been the victims of discriminatory exclusion from the schools whose tax exemptions they challenge as unlawful. Indeed, they have not alleged at any stage of this litigation that their children have ever applied or would ever apply to any private school. See *Wright* v. *Regan*, 211 U. S. App. D. C. 231, 238, 656 F. 2d 820, 827 (1981) ("Plaintiffs . . . maintain they have no interest whatever in enrolling their children in a private school"). Rather, respondents claim a direct injury from the mere fact of the challenged Government conduct and, as indicated by the restriction of the plaintiff class to parents of children in desegregating school districts, injury to their children's opportunity to receive a desegregated education.[13] The latter injury is traceable to the IRS grant of tax exemptions to racially discriminatory schools, respondents allege, chiefly because contributions to such schools are deductible from income taxes under §§ 170(a)(1) and (c)(2) of the Internal Revenue Code and the "deductions facilitate the raising of funds to organize new schools and expand existing schools in order to accommodate white students avoiding attendance in desegregating public school districts." App. 24.[14]

Respondents request only prospective relief. *Id.*, at 40–41. They ask for a declaratory judgment that the challenged IRS tax-exemption practices are unlawful. They also

---

[13] Respondents did not allege in their 1976 complaint that their children were currently attending racially segregated schools. In 1979, during argument before the District Court, counsel for respondents stated that his clients' children "do go to desegregated schools . . . ." App. 62.

[14] Several additional tax benefits accrue to an organization receiving a tax exemption under § 501(c)(3) of the Code. Such an organization is exempt not only from income taxes but also from federal social security taxes, 26 U. S. C. § 3121(b)(8)(B), and from federal unemployment taxes, 26 U. S. C. § 3306(c)(8). Moreover, contributions to the organization are deductible not only from income taxes, 26 U. S. C. §§ 170(a)(1) and (c)(2), but also from federal estate taxes, 26 U. S. C. § 2055(a)(2), and from federal gift taxes, 26 U. S. C. § 2522(a)(2).

ask for an injunction requiring the IRS to deny tax exemptions to a considerably broader class of private schools than the class of racially discriminatory private schools. Under the requested injunction, the IRS would have to deny tax-exempt status to all private schools

"which have insubstantial or nonexistent minority enrollments, which are located in or serve desegregating public school districts, and which either—
"(1) were established or expanded at or about the time the public school districts in which they are located or which they serve were desegregating;
"(2) have been determined in adversary judicial or administrative proceedings to be racially segregated; or
"(3) cannot demonstrate that they do not provide racially segregated educational opportunities for white children avoiding attendance in desegregating public school systems . . . ." *Id.*, at 40.

Finally, respondents ask for an order directing the IRS to replace its 1975 guidelines with standards consistent with the requested injunction.

In May 1977 the District Court permitted intervention as a defendant by petitioner Allen, the head of one of the private school systems identified in the complaint. *Id.*, at 54–55. Thereafter, progress in the lawsuit was stalled for several years. During this period, the IRS reviewed its challenged policies and proposed new Revenue Procedures to tighten requirements for eligibility for tax-exempt status for private schools. See 43 Fed. Reg. 37296 (1978); 44 Fed. Reg. 9451 (1979).[15] In 1979, however, Congress blocked any strength-

---

[15] The first proposal was made on August 22, 1978. 43 Fed. Reg. 37296. It placed the burden of proving good faith operation on a nondiscriminatory basis, evaluated according to specified factors, on any private school that had an insignificant number of minority students and that had been formed or substantially expanded at a time the public schools in its community were undergoing desegregation. The second proposal was made

ening of the IRS guidelines at least until October 1980.[16] The District Court thereupon considered and granted the defendants' motion to dismiss the complaint, concluding that respondents lack standing, that the judicial task proposed by respondents is inappropriately intrusive for a federal court, and that awarding the requested relief would be contrary to the will of Congress expressed in the 1979 ban on strengthening IRS guidelines. *Wright* v. *Miller,* 480 F. Supp. 790 (DC 1979).

The United States Court of Appeals for the District of Columbia Circuit reversed, concluding that respondents have standing to maintain this lawsuit. The court acknowledged that *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S. 26 (1976), "suggests that litigation concerning tax liability is a matter between taxpayer and IRS, with the door

on February 13, 1979, after public comment and hearings. 44 Fed. Reg. 9451. It afforded private schools "greater flexibility" in proving nondiscriminatory operation, permitting satisfaction of this proof requirement by a showing that the school has "undertaken actions or programs reasonably designed to attract minority students on a continuing basis." *Id.,* at 9452, 9454.

[16] Treasury, Postal Service, and General Government Appropriations Act of 1980, §§ 103 and 615, 93 Stat. 562, 577. Section 615 of the Act, known as the Dornan Amendment, specifically forbade the use of funds to carry out the IRS's proposed Revenue Procedures. Section 103 of the Act, known as the Ashbrook Amendment, more generally forbade the use of funds to make the requirements for tax-exempt status of private schools more stringent than those in effect prior to the IRS's proposal of its new Revenue Procedures.

These provisions expired on October 1, 1980, but Congress maintained its interest in IRS policies regarding tax exemptions for racially discriminatory private schools. The Dornan and Ashbrook Amendments were reinstated for the period December 16, 1980, through September 30, 1981. H. J. Res. 644, Pub. L. 96–536, §§ 101(a)(1) and (4), 94 Stat. 3166, as amended by Supplemental Appropriations and Rescission Act of 1981, § 401, 95 Stat. 95. For fiscal year 1982, Congress specifically denied funding for carrying out not only administrative actions but also court orders entered after the date of the IRS's proposal of its first revised Revenue Procedure. H. J. Res. 325, Pub. L. 97–51, § 101(a)(3), 95 Stat. 958. No such spending restrictions are currently in force.

barely ajar for third party challenges." 211 U. S. App. D. C., at 239, 656 F. 2d, at 828. The court concluded, however, that the *Simon* case is inapposite because respondents claim no injury dependent on taxpayers' actions: "[t]hey claim indifference as to the course private schools would take." *Id.*, at 240, 656 F. 2d, at 829.[17] Instead, the court observed, "[t]he sole injury [respondents] claim is the denigration they suffer as black parents and schoolchildren when their government graces with tax-exempt status educational institutions in their communities that treat members of their race as persons of lesser worth." *Id.*, at 238, 656 F. 2d, at 827. The court held this denigration injury enough to give respondents standing since it was this injury which supported standing in *Coit* v. *Green*, 404 U. S. 997 (1971), summarily aff'g *Green* v. *Connally*, 330 F. Supp. 1150 (DC); *Norwood* v. *Harrison*, 413 U. S. 455 (1973); and *Gilmore* v. *City of Montgomery*, 417 U. S. 556 (1974). 211 U. S. App. D. C., at 239–243, 656 F. 2d, at 828–832. The Court of Appeals also held that the 1979 congressional actions were not intended to preclude judicial remedies and that the relief requested by respondents could be fashioned "without large scale judicial intervention in the administrative process," *id.*, at 248, 656 F. 2d, at 837.[18] The court accordingly remanded the case to the District Court for further proceedings, enjoining the defendants meanwhile from granting tax-exempt status to any racially discriminatory school, App. 81–84.

---

[17] Indeed, the Court of Appeals observed that respondents "do not dispute that it is 'speculative,' within the *Eastern Kentucky* frame, whether any private school would welcome blacks in order to retain tax exemption or would relinquish exemption to retain current practices." 211 U. S. App. D. C., at 240, 656 F. 2d, at 829 (footnotes omitted).

[18] Judge Tamm dissented from the holding of the Court of Appeals. He concluded that standing in the three cases relied on by the majority was based on injury to rights under a court decree and that respondents in this case asserted nothing more than the abstract interest in securing enforcement of the law against the Government. *Id.*, at 249–259, 656 F. 2d, at 838–848.

The Government defendants and defendant-intervenor Allen filed separate petitions for a writ of certiorari in this Court. They both sought review of the Court of Appeals' holding that respondents have standing to bring this lawsuit. We granted certiorari, 462 U. S. 1130 (1983), and now reverse.

## II

## A

Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." As the Court explained in *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 471–476 (1982), the "case or controversy" requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded. The several doctrines that have grown up to elaborate that requirement are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth* v. *Seldin*, 422 U. S. 490, 498 (1975).

> "All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Vander Jagt* v. *O'Neill*, 226 U. S. App. D. C. 14, 26–27, 699 F. 2d 1166, 1178–1179 (1983) (Bork, J., concurring).

The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government.

The Art. III doctrine that requires a litigant to have "standing" to invoke the power of a federal court is perhaps the most important of these doctrines. "In essence the question of standing is whether the litigant is entitled to have the

court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin, supra,* at 498. Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked. See *Valley Forge, supra,* at 474–475. The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. 454 U. S., at 472.

Like the prudential component, the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition. The injury alleged must be, for example, "'distinct and palpable,'" *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 100 (1979) (quoting *Warth* v. *Seldin, supra,* at 501), and not "abstract" or "conjectural" or "hypothetical," *Los Angeles* v. *Lyons,* 461 U. S. 95, 101–102 (1983); *O'Shea* v. *Littleton,* 414 U. S. 488, 494 (1974). The injury must be "fairly" traceable to the challenged action, and relief from the injury must be "likely" to follow from a favorable decision. See *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S., at 38, 41. These terms cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise.

The absence of precise definitions, however, as this Court's extensive body of case law on standing illustrates, see generally *Valley Forge, supra,* at 471–476, hardly leaves courts at sea in applying the law of standing. Like most legal notions, the standing concepts have gained considerable definition from developing case law. In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing

cases.   See, *e. g., Los Angeles* v. *Lyons, supra,* at 102–105. More important, the law of Art. III standing is built on a single basic idea—the idea of separation of powers.   It is this fact which makes possible the gradual clarification of the law through judicial application.   Of course, both federal and state courts have long experience in applying and elaborating in numerous contexts the pervasive and fundamental notion of separation of powers.

Determining standing in a particular case may be facilitated by clarifying principles or even clear rules developed in prior cases.   Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable?   Is the line of causation between the illegal conduct and injury too attenuated?   Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?   These questions and any others relevant to the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity," *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339, 345 (1892), and only when adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process," *Flast* v. *Cohen,* 392 U. S. 83, 97 (1968). See *Valley Forge,* 454 U. S., at 472–473.

### B

Respondents allege two injuries in their complaint to support their standing to bring this lawsuit.   First, they say that they are harmed directly by the mere fact of Government financial aid to discriminatory private schools. Second, they say that the federal tax exemptions to racially discriminatory private schools in their communities impair

their ability to have their public schools desegregated. See *supra*, at 745.

In the Court of Appeals, respondents apparently relied on the first injury. Thus, the court below asserted that "[t]he sole injury [respondents] claim is the denigration they suffer" as a result of the tax exemptions. 211 U. S. App. D. C., at 238, 656 F. 2d, at 827. In this Court, respondents have not focused on this claim of injury. Here they stress the effect of the tax exemptions on their "equal educational opportunities," see, *e. g.*, Brief for Respondents 12, 14, renewing reliance on the second injury described in their complaint.

Because respondents have not clearly disclaimed reliance on either of the injuries described in their complaint, we address both allegations of injury. We conclude that neither suffices to support respondents' standing. The first fails under clear precedents of this Court because it does not constitute judicially cognizable injury. The second fails because the alleged injury is not fairly traceable to the assertedly unlawful conduct of the IRS.[19]

1

Respondents' first claim of injury can be interpreted in two ways. It might be a claim simply to have the Government

_____

[19] The "fairly traceable" and "redressability" components of the constitutional standing inquiry were initially articulated by this Court as "two facets of a single causation requirement." C. Wright, Law of Federal Courts § 13, p. 68, n. 43 (4th ed. 1983). To the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested. Cases such as this, in which the relief requested goes well beyond the violation of law alleged, illustrate why it is important to keep the inquiries separate if the "redressability" component is to focus on the requested relief. Even if the relief respondents request might have a substantial effect on the desegregation of public schools, whatever deficiencies exist in the opportunities for desegregated education for respondents' children might not be traceable to IRS violations of law—grants of tax exemptions to racially discriminatory schools in respondents' communities.

avoid the violation of law alleged in respondents' complaint. Alternatively, it might be a claim of stigmatic injury, or denigration, suffered by all members of a racial group when the Government discriminates on the basis of race.[20] Under neither interpretation is this claim of injury judicially cognizable.

This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court. In *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S. 208 (1974), for example, the Court rejected a claim of citizen standing to challenge Armed Forces Reserve commissions held by Members of Congress as violating the Incompatibility Clause of Art. I, § 6, of the Constitution. As citizens, the Court held, plaintiffs alleged nothing but "the abstract injury in nonobservance of the Constitution . . . ." *Id.*, at 223, n. 13. More recently, in *Valley Forge, supra,* we rejected a claim of standing to challenge a Government conveyance of property to a religious institution. Insofar as the plaintiffs relied simply on "'their shared individuated right'" to a Government that made no law respecting an establishment of religion, *id.*, at 482 (quoting *Americans United* v. *U. S. Dept. of HEW*, 619 F. 2d 252, 261 (CA3 1980)), we held that plaintiffs had not alleged a judicially cognizable injury. "[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." 454 U. S., at 483. See also *United States* v. *Richardson*, 418 U. S. 166 (1974); *Laird* v. *Tatum*, 408 U. S. 1 (1972);

---

[20] We assume, *arguendo*, that the asserted stigmatic injury may be caused by the Government's grant of tax exemptions to racially discriminatory schools even if the Government is granting those exemptions without knowing or believing that the schools in fact discriminate. That is, we assume, without deciding, that the challenged Government tax exemptions are the equivalent of Government discrimination.

*Ex parte Lévitt*, 302 U. S. 633 (1937). Respondents here have no standing to complain simply that their Government is violating the law.

Neither do they have standing to litigate their claims based on the stigmatizing injury often caused by racial discrimination. There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing. See *Heckler* v. *Mathews*, 465 U. S. 728, 739–740 (1984). Our cases make clear, however, that such injury accords a basis for standing only to "those persons who are personally denied equal treatment" by the challenged discriminatory conduct, *ibid.*

In *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163 (1972), the Court held that the plaintiff had no standing to challenge a club's racially discriminatory membership policies because he had never applied for membership. *Id.*, at 166–167. In *O'Shea* v. *Littleton*, 414 U. S. 488 (1974), the Court held that the plaintiffs had no standing to challenge racial discrimination in the administration of their city's criminal justice system because they had not alleged that they had been or would likely be subject to the challenged practices. The Court denied standing on similar facts in *Rizzo* v. *Goode*, 423 U. S. 362 (1976). In each of those cases, the plaintiffs alleged official racial discrimination comparable to that alleged by respondents here. Yet standing was denied in each case because the plaintiffs were not personally subject to the challenged discrimination. Insofar as their first claim of injury is concerned, respondents are in exactly the same position: unlike the appellee in *Heckler* v. *Mathews, supra*, at 740–741, n. 9, they do not allege a stigmatic injury suffered as a direct result of having personally been denied equal treatment.

The consequences of recognizing respondents' standing on the basis of their first claim of injury illustrate why our cases plainly hold that such injury is not judicially cognizable. If the abstract stigmatic injury were cognizable, standing

would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school. All such persons could claim the same sort of abstract stigmatic injury respondents assert in their first claim of injury. A black person in Hawaii could challenge the grant of a tax exemption to a racially discriminatory school in Maine. Recognition of standing in such circumstances would transform the federal courts into "no more than a vehicle for the vindication of the value interests of concerned bystanders." *United States* v. *SCRAP,* 412 U. S. 669, 687 (1973). Constitutional limits on the role of the federal courts preclude such a transformation.[21]

2

It is in their complaint's second claim of injury that respondents allege harm to a concrete, personal interest that can support standing in some circumstances. The injury they identify—their children's diminished ability to receive an education in a racially integrated school—is, beyond any doubt, not only judicially cognizable but, as shown by cases from *Brown* v. *Board of Education,* 347 U. S. 483 (1954), to *Bob Jones University* v. *United States,* 461 U. S. 574 (1983), one of the most serious injuries recognized in our legal system. Despite the constitutional importance of curing the

---

[21] Cf. *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 489–490, n. 26 (1982) (citations omitted): "Were we to recognize standing premised on an 'injury' consisting solely of an alleged violation of a ' "personal constitutional right" to a government that does not establish religion,' a principled consistency would dictate recognition of respondents' standing to challenge execution of every capital sentence on the basis of a personal right to a government that does not impose cruel and unusual punishment, or standing to challenge every affirmative-action program on the basis of a personal right to a government that does not deny equal protection of the laws, to choose but two among as many possible examples as there are commands in the Constitution."

injury alleged by respondents, however, the federal judiciary may not redress it unless standing requirements are met. In this case, respondents' second claim of injury cannot support standing because the injury alleged is not fairly traceable to the Government conduct respondents challenge as unlawful.[22]

The illegal conduct challenged by respondents is the IRS's grant of tax exemptions to some racially discriminatory schools. The line of causation between that conduct and desegregation of respondents' schools is attenuated at best. From the perspective of the IRS, the injury to respondents is highly indirect and "results from the independent action of some third party not before the court," *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S., at 42. As the Court pointed out in *Warth* v. *Seldin*, 422 U. S., at 505, "the

---

[22] Respondents' stigmatic injury, though not sufficient for standing in the abstract form in which their complaint asserts it, is judicially cognizable to the extent that respondents are personally subject to discriminatory treatment. See *Heckler* v. *Mathews*, 465 U. S. 728, 739–740 (1984). The stigmatic injury thus requires identification of some concrete interest with respect to which respondents are personally subject to discriminatory treatment. That interest must independently satisfy the causation requirement of standing doctrine.

In *Heckler* v. *Mathews*, for example, the named plaintiff (appellee) was being denied monetary benefits allegedly on a discriminatory basis. We specifically pointed out that the causation component of standing doctrine was satisfied with respect to the claimed benefits. In distinguishing the case from *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S. 26 (1976), we said: "there can be no doubt about the direct causal relationship between the Government's alleged deprivation of appellee's right to equal protection and the personal injury appellee has suffered—denial of Social Security benefits solely on the basis of his gender." 465 U. S., at 741, n. 9.

In this litigation, respondents identify only one interest that they allege is being discriminatorily impaired—their interest in desegregated public school education. Respondents' asserted stigmatic injury, therefore, is sufficient to support their standing in this litigation only if their school-desegregation injury independently meets the causation requirement of standing doctrine.

indirectness of the injury . . . may make it substantially more difficult to meet the minimum requirement of Art. III . . . ."

The diminished ability of respondents' children to receive a desegregated education would be fairly traceable to unlawful IRS grants of tax exemptions only if there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration. Respondents have made no such allegation. It is, first, uncertain how many racially discriminatory private schools are in fact receiving tax exemptions.[23] Moreover, it is entirely speculative, as respondents themselves conceded in the Court of Appeals, see n. 17, *supra,* whether withdrawal of a tax exemption from any particular school would lead the school to change its policies. See 480 F. Supp., at 796. It is just as speculative whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status. It is also pure speculation whether, in a particular community, a large enough number of the numerous relevant school officials and parents would reach decisions that collectively would have a significant impact on the racial composition of the public schools.

---

[23] Indeed, contrary to the suggestion of JUSTICE BRENNAN's dissent, *post,* at 774–775, and n. 5, of the schools identified in respondents' complaint, none of those alleged to be directly receiving a tax exemption is alleged to be racially discriminatory, and only four schools—Delta Christian Academy and Tallulah Academy in Madison Parish, La.; River Oaks School in Monroe, La.; and Bowman Academy in Orangeburg, S. C.—are alleged to have discriminatory policies that deprive them of direct tax exemptions yet operate under the umbrella of a tax-exempt organization. These allegations constitute an insufficient basis for the only claim made by respondents—a claim for a change in the IRS regulations and practices. Cf. *Wright* v. *Miller,* 480 F. Supp. 790, 796 (DC 1979) ("it is purely speculative whether, in the final analysis, any fewer schools would be granted tax exemptions under plaintiffs' system than under the current IRS system").

The links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain respondents' standing. In *Simon* v. *Eastern Kentucky Welfare Rights Org.*, *supra*, the Court held that standing to challenge a Government grant of a tax exemption to hospitals could not be founded on the asserted connection between the grant of tax-exempt status and the hospitals' policy concerning the provision of medical services to indigents.[24] The causal connection depended on the decisions hospitals would make in response to withdrawal of tax-exempt status, and those decisions were sufficiently uncertain to break the chain of causation between the plaintiffs' injury and the challenged Government action. *Id.*, at 40–46. See also *Warth* v. *Seldin, supra*. The chain of causation is even weaker in this case. It involves numerous third parties (officials of racially discriminatory schools receiving tax exemptions and the parents of children attending such schools) who may not even exist in respondents' communities and whose independent decisions may not collectively have a significant effect on the ability of public school students to receive a desegregated education.

The idea of separation of powers that underlies standing doctrine explains why our cases preclude the conclusion that respondents' alleged injury "fairly can be traced to the challenged action" of the IRS. *Simon* v. *Eastern Kentucky Welfare Rights Org., supra*, at 41. That conclusion would pave the way generally for suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations. Such suits, even when premised on allegations of

---

[24] *Simon* v. *Eastern Kentucky Welfare Rights Org., supra*, framed its standing discussion in terms of the redressability of the alleged injury. The relief requested by the plaintiffs, however, was simply the cessation of the allegedly illegal conduct. In those circumstances, as the opinion for the Court in *Simon* itself illustrates, see *id.*, at 40–46, the "redressability" analysis is identical to the "fairly traceable" analysis. See n. 19, *supra*.

several instances of violations of law, are rarely if ever appropriate for federal-court adjudication.

> "Carried to its logical end, [respondents'] approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the 'power of the purse'; it is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action." *Laird* v. *Tatum*, 408 U. S., at 15.

See also *Gilligan* v. *Morgan*, 413 U. S. 1, 14 (1973) (BLACKMUN, J., concurring).

The same concern for the proper role of the federal courts is reflected in cases like *O'Shea* v. *Littleton*, 414 U. S. 488 (1974), *Rizzo* v. *Goode*, 423 U. S. 362 (1976), and *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983). In all three cases plaintiffs sought injunctive relief directed at certain systemwide law enforcement practices.[25] The Court held in each case that, absent an allegation of a specific threat of being subject to the challenged practices, plaintiffs had no standing to ask for an injunction. Animating this Court's holdings was the principle that "[a] federal court . . . is not the proper forum to .press" general complaints about the way in which government goes about its business. *Id.*, at 112.

Case-or-controversy considerations, the Court observed in *O'Shea* v. *Littleton*, *supra*, at 499, "obviously shade into those determining whether the complaint states a sound basis for equitable relief." The latter set of considerations should therefore inform our judgment about whether respondents

---

[25] In *O'Shea* v. *Littleton* and *Rizzo* v. *Goode*, the plaintiffs sought wide-ranging reform of local law enforcement systems. In *Los Angeles* v. *Lyons*, by contrast, the plaintiff sought cessation of a particular police practice. The Court concluded in *Lyons*, however, that this difference did not distinguish the cases for standing purposes as long as the plaintiff could show no realistic threat of being subject to the challenged practice.

have standing. Most relevant to this case is the principle articulated in *Rizzo* v. *Goode, supra,* at 378–379:

> "When a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with 'the well-established rule that the Government has traditionally been granted the widest latitude in the "dispatch of its own internal affairs," *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 896 (1961),' quoted in *Sampson* v. *Murray,* 415 U. S. 61, 83 (1974)."

When transported into the Art. III context, that principle, grounded as it is in the idea of separation of powers, counsels against recognizing standing in a case brought, not to enforce specific legal obligations whose violation works a direct harm, but to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties. The Constitution, after all, assigns to the Executive Branch, and not to the Judicial Branch, the duty to "take Care that the Laws be faithfully executed." U. S. Const., Art. II, § 3. We could not recognize respondents' standing in this case without running afoul of that structural principle.[26]

## C

The Court of Appeals relied for its contrary conclusion on *Gilmore* v. *City of Montgomery,* 417 U. S. 556 (1974), on *Norwood* v. *Harrison,* 413 U. S. 455 (1973), and on *Coit* v. *Green,* 404 U. S. 997 (1971), summarily aff'g *Green* v. *Con-*

---

[26] We disagree with JUSTICE STEVENS' suggestions that separation of powers principles merely underlie standing requirements, have no role to play in giving meaning to those requirements, and should be considered only under a distinct justiciability analysis. *Post,* at 789–792. Moreover, our analysis of this case does not rest on the more general proposition that no consequence of the allocation of administrative enforcement resources is judicially cognizable. *Post,* at 792–793. Rather, we rely on separation of powers principles to interpret the "fairly traceable" component of the standing requirement.

*nally*, 330 F. Supp. 1150 (DC). Respondents in this Court, though stressing a different injury from the one emphasized by the Court of Appeals, see *supra*, at 752–753, place principal reliance on those cases as well. None of the cases, however, requires that we find standing in this lawsuit.

In *Gilmore* v. *City of Montgomery*, *supra*, the plaintiffs asserted a constitutional right, recognized in an outstanding injunction, to use the city's public parks on a nondiscriminatory basis. They alleged that the city was violating that equal protection right by permitting racially discriminatory private schools and other groups to use the public parks. The Court recognized plaintiffs' standing to challenge this city policy insofar as the policy permitted the exclusive use of the parks by racially discriminatory private schools: the plaintiffs had alleged direct cognizable injury to their right to nondiscriminatory access to the public parks. *Id.*, at 570–571, n. 10.[27]

Standing in *Gilmore* thus rested on an allegation of direct deprivation of a right to equal use of the parks. Like the plaintiff in *Heckler* v. *Mathews*—indeed, like the plaintiffs having standing in virtually any equal protection case—the plaintiffs in *Gilmore* alleged that they were personally being denied equal treatment. 465 U. S., at 740–741, n. 9. The *Gilmore* Court did not rest its finding of standing on an abstract denigration injury, and no problem of attenuated causation attended the plaintiffs' claim of injury.[28]

---

[27] On the merits, the Court found that permitting such exclusive use by school groups was unlawful, because it violated the city's constitutional obligation, spelled out in an outstanding school-desegregation order, to take no action that would impede the integration of the public schools. Exclusive availabililty of the public parks "significantly enhanced the attractiveness of segregated private schools . . . by enabling them to offer complete athletic programs." 417 U. S., at 569.

[28] Indeed, the Court stressed the importance of a particularized factual record when it stated that it was "not prepared, at this juncture and on this record, to assume the standing of these plaintiffs to claim relief against certain nonexclusive uses by private school groups." *Id.*, at 570, n. 10. "Without a properly developed record," said the Court, it was not clear

In *Norwood* v. *Harrison, supra,* parents of public school children in Tunica County, Miss., filed a statewide class action challenging the State's provision of textbooks to students attending racially discriminatory private schools in the State. The Court held the State's practice unconstitutional because it breached "the State's acknowledged duty to establish a unitary school system," *id.,* at 460–461.   See *id.,* at 463–468.   The Court did not expressly address the basis for the plaintiffs' standing.

In *Gilmore,* however, the Court identified the basis for standing in *Norwood:* "The plaintiffs in *Norwood* were parties to a school desegregation order and the relief they sought was directly related to the concrete injury they suffered." 417 U. S., at 571, n. 10.   Through the school-desegregation decree, the plaintiffs had acquired a right to have the State "steer clear" of any perpetuation of the racially dual school system that it had once sponsored.   413 U. S., at 467.   The interest acquired was judicially cognizable because it was a personal interest, created by law, in having the State refrain from taking specific actions.   Cf. *Warth* v. *Seldin,* 422 U. S., at 500 (standing may exist by virtue of legal rights created by statute).   The plaintiffs' complaint alleged that the State directly injured that interest by aiding racially discriminatory private schools.   Respondents in this lawsuit, of course, have no injunctive rights against the IRS that are allegedly being harmed by the challenged IRS action.

Unlike *Gilmore* and *Norwood, Coit* v. *Green, supra,* cannot easily be seen to have based standing on an injury different in kind from any asserted by respondents here.   The plaintiffs

---

that such nonexclusive use "would result in cognizable injury to these plaintiffs." *Id.,* at 571, n. 10.

The Court said nothing about the plaintiffs' standing to challenge the use of the parks, exclusive or nonexclusive, by racially discriminatory groups other than schools.   It was unnecessary to do so because the Court declined to consider the merits of that challenge on the record before it. *Id.,* at 570–574.

in *Coit*, parents of black schoolchildren in Mississippi, sued to enjoin the IRS grant of tax exemptions to racially discriminatory private schools in the State. Nevertheless, *Coit* in no way mandates the conclusion that respondents have standing.

First, the decision has little weight as a precedent on the law of standing. This Court's decision in *Coit* was merely a summary affirmance; for that reason alone it could hardly establish principles contrary to those set out in opinions issued after full briefing and argument. See *Fusari* v. *Steinberg,* 419 U. S. 379, 392 (1975) (BURGER, C. J., concurring); see also *Tully* v. *Griffin, Inc.,* 429 U. S. 68, 74 (1976). Moreover, when the case reached this Court, the plaintiffs and the IRS were no longer adverse parties; and the ruling that was summarily affirmed, *Green* v. *Connally,* 330 F. Supp. 1150 (DC 1971), did not include a ruling on the issue of standing, which had been briefly considered in a prior ruling of the District Court, *Green* v. *Kennedy,* 309 F. Supp. 1127, 1132 (DC), appeal dism'd *sub nom. Cannon* v. *Green,* 398 U. S. 956 (1970). Thus, "the Court's affirmance in *Green* lacks the precedential weight of a case involving a truly adversary controversy." *Bob Jones University* v. *Simon,* 416 U. S. 725, 740, n. 11 (1974).

In any event, the facts in the *Coit* case are sufficiently different from those presented in this lawsuit that the absence of standing here is unaffected by the possible propriety of standing there. In particular, the suit in *Coit* was limited to the public schools of one State. Moreover, the District Court found, based on extensive evidence before it as well as on the findings in *Coffey* v. *State Educational Finance Comm'n,* 296 F. Supp. 1389 (SD Miss. 1969), that large numbers of segregated private schools had been established in the State for the purpose of avoiding a unitary public school system, 309 F. Supp., at 1133–1134; that the tax exemptions were critically important to the ability of such schools to succeed, *id.,* at 1134–1136; and that the connection between

the grant of tax exemptions to discriminatory schools and desegregation of the public schools in the particular State was close enough to warrant the conclusion that irreparable injury to the interest in desegregated education was threatened if the tax exemptions continued, *id.*, at 1138–1139.[29] What made possible those findings was the fact that, when the Mississippi plaintiffs filed their suit, the IRS had a policy of granting tax exemptions to racially discriminatory private schools; thus, the suit was initially brought, not simply to reform Executive Branch enforcement procedures, but to challenge a fundamental IRS policy decision, which affected numerous identifiable schools in the State of Mississippi. See *id.*, at 1130.[30]

The limited setting, the history of school desegregation in Mississippi at the time of the *Coit* litigation, the nature of the IRS conduct challenged at the outset of the litigation, and the District Court's particular findings, which were never challenged as clearly erroneous, see Motion to Dismiss or Affirm in *Coit* v. *Green*, O. T. 1971, No. 71–425, p. 13, amply distinguish the *Coit* case from respondents' lawsuit. Thus, we

---

[29] In *Norwood* v. *Harrison*, 413 U. S. 455, 467, n. 9 (1973), this Court described the experience of one county in Mississippi: "all white children were withdrawn from public schools and placed in a private academy housed in local church facilities and staffed by the principal and 17 high school teachers of the county system, who resigned in mid-year to accept jobs at the new academy." The Court observed that similar histories in various other localities in Mississippi were recited by the plaintiffs without challenge. *Ibid.*

[30] The relatively simple either-or nature of the challenged decision affects the extent to which the initial complaint implicated separation of powers concerns. When the IRS altered its policy concerning the grant of tax exemptions to racially discriminatory schools, see *Green* v. *Connally*, 330 F. Supp., at 1156, the plaintiffs were left with an action more closely resembling this lawsuit. We have no occasion to consider here the effect on a plaintiff's standing of a defendant's partial cessation of challenged conduct when that partial cessation leaves the plaintiff with a complaint presenting substantially greater uncertainty about standing than the initial complaint did.

need not consider whether standing was properly found to exist in *Coit*. Whatever the answer to that question, respondents' complaint, which aims at nationwide relief and does not challenge particular identified unlawful IRS actions, alleges no connection between the asserted desegregation injury and the challenged IRS conduct direct enough to overcome the substantial separation of powers barriers to a suit seeking an injunction to reform administrative procedures.

## III

"The necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement." *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S., at 39. Respondents have not met this fundamental requirement. The judgment of the Court of Appeals is accordingly reversed, and the injunction issued by that court is vacated.

*It is so ordered.*

JUSTICE MARSHALL took no part in the decision of these cases.

JUSTICE BRENNAN, dissenting.

Once again, the Court "uses 'standing to slam the courthouse door against plaintiffs who are entitled to full consideration of their claims on the merits.'" *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 490 (1982) (BRENNAN, J., dissenting) (quoting *Barlow* v. *Collins*, 397 U. S. 159, 178 (1970) (BRENNAN, J., concurring in result and dissenting)). And once again, the Court does so by "wax[ing] eloquent" on considerations that provide little justification for the decision at hand. See 454 U. S., at 491. This time, however, the Court focuses on "the idea of separation of powers," *ante*, at 750, 752, 759, 761, as if the mere incantation of that phrase provides an obvious solution to the difficult questions presented by these cases.

One could hardly dispute the proposition that Art. III of the Constitution, by limiting the judicial power to "Cases" or "Controversies," embodies the notion that each branch of our National Government must confine its actions to those that are consistent with our scheme of separated powers. But simply stating that unremarkable truism provides little, if any, illumination of the standing inquiry that must be undertaken by a federal court faced with a particular action filed by particular plaintiffs. "The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government." *Flast* v. *Cohen*, 392 U. S. 83, 100 (1968).

The Court's attempt to obscure the standing question must be seen, therefore, as no more than a cover for its failure to recognize the nature of the specific claims raised by the respondents in these cases. By relying on generalities concerning our tripartite system of government, the Court is able to conclude that the respondents lack standing to maintain this action without acknowledging the precise nature of the injuries they have alleged. In so doing, the Court displays a startling insensitivity to the historical role played by the federal courts in eradicating race discrimination from our Nation's schools—a role that has played a prominent part in this Court's decisions from *Brown* v. *Board of Education*, 347 U. S. 483 (1954), through *Bob Jones University* v. *United States*, 461 U. S. 574 (1983). Because I cannot join in such misguided decisionmaking, I dissent.

I

The respondents, suing individually and on behalf of their minor children, are parents of black children attending public schools in various school districts across the Nation. Each of these school districts, the respondents allege,[1] was once seg-

---

[1] Because the District Court granted a motion to dismiss, see *Wright* v. *Miller*, 480 F. Supp. 790, 793 (DC 1979), we must " 'accept as true all mate-

regated and is now in the process of desegregating pursuant to court order, federal regulations or guidelines, state law, or voluntary agreement. Moreover, each contains one or more private schools that discriminate against black schoolchildren and that operate with the assistance of tax exemptions unlawfully granted to them by the Internal Revenue Service (IRS). See Complaint ¶¶ 24–48, App. 26–38.

To eliminate this federal financial assistance for discriminating schools, the respondents seek a declaratory judgment that current IRS practices are inadequate both in identifying racially discriminatory schools and in denying requested tax exemptions or revoking existing exemptions for any schools so identified. In particular, they allege that existing IRS guidelines permit schools to receive tax exemptions simply by adopting and certifying—but not implementing—a policy of nondiscrimination. Pursuant to these ineffective guidelines,[2] many private schools that discriminate on the basis of

rial allegations of the complaint, and . . . construe the complaint in favor of the complaining party.'" *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 109 (1979) (quoting *Warth* v. *Seldin,* 422 U. S. 490, 501 (1975)). See 441 U. S., at 112. Cf. *Conley* v. *Gibson,* 355 U. S. 41, 45–46 (1957).

[2] As I have recognized in n. 1, *supra,* we must accept as true the factual allegations made by the respondents. It nonetheless should be noted that significant evidence exists to support the respondents' claim that the IRS guidelines are ineffective. Indeed, the Commissioner of Internal Revenue admitted as much in testimony before the Congress:

"This litigation prompted the Service once again to review its procedures in this area. It focused our attention on the adequacy of existing policies and procedures as we moved to formulate a litigation position. *We concluded that the Service's procedures were ineffective in identifying schools which in actual operation discriminate against minority students,* even though the schools may profess an open enrollment policy and comply with the yearly publication requirements of Revenue Procedure 75–50.

.      .      .      .      .

"A clear indication that our rules require strengthening is the fact that a number of private schools continue to hold tax exemption even though they have been held by Federal courts to be racially discriminatory. *This position is indefensible.* Just last year the U. S. Commission on Civil Rights

race continue to benefit illegally from their tax-exempt status and the resulting charitable deductions granted to taxpayers who contribute to such schools. The respondents therefore seek a permanent injunction requiring the IRS to deny tax exemptions to any private schools

"which have insubstantial or non-existent minority enrollments, which are located in or serve desegregating school districts, and which either—

"(a) were established or expanded at or about the time the public school districts in which they are located or which they serve were desegregating;

"(b) have been determined in adversary judicial or administrative proceedings to be racially segregated; or

"(c) cannot demonstrate that they do not provide racially segregated educational opportunities for white children avoiding attendance in desegregating public school systems." Complaint ¶4, App. 19.

This requested relief is substantially similar to the enforcement guidelines promulgated by the IRS itself in 1978 and 1979, before congressional action temporarily stayed, and the agency withdrew, the amended procedures. See 44 Fed. Reg. 9451 (1979); 43 Fed. Reg. 37296 (1978). Cf. *ante*, at 747, and nn. 15–16.

---

criticized the Service's enforcement in this area as inadequate, emphasizing the continuing tax exemption of such adjudicated schools." Tax-Exempt Status of Private Schools: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 96th Cong., 1st Sess., 5 (1979) (statement of Jerome Kurtz, Commissioner of Internal Revenue) (emphasis added).

See also *id.*, at 236–251 (letter and memorandum from U. S. Commission on Civil Rights criticizing IRS enforcement policies); *id.*, at 1181–1182, 1187–1191 (statement and letter from Civil Rights Division of the Department of Justice criticizing IRS guidelines).

## II

Persons seeking judicial relief from an Art. III court must have standing to maintain their cause of action. At a minimum, the standing requirement is not met unless the plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends . . . ." *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). Under the Court's cases, this "personal stake" requirement is satisfied if the person seeking redress has suffered, or is threatened with, some "distinct and palpable injury," *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975), and if there is some causal connection between the asserted injury and the conduct being challenged, *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S. 26, 41 (1976). See *Heckler* v. *Mathews*, 465 U. S. 728, 738 (1984); *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 376 (1982); *Valley Forge*, 454 U. S., at 472.

## A

In these cases, the respondents have alleged at least one type of injury that satisfies the constitutional requirement of "distinct and palpable injury."[3]  In particular, they claim

---

[3] Because I conclude that the second injury alleged by the respondents is sufficient to satisfy constitutional requirements, I do not need to reach what the Court labels the "stigmatic injury." See *ante*, at 754–756, and n. 22.  I note, however, that the Court has mischaracterized this claim of injury by misreading the complaint filed by the respondents.  In particular, the respondents have not simply alleged that, as blacks, they have suffered the denigration injury "suffered by all members of a racial group when the Government discriminates on the basis of race." *Ante*, at 754. Rather, the complaint, fairly read, limits the claim of stigmatic injury from illegal governmental action to black children attending public schools in districts that are currently desegregating yet contain discriminatory private schools benefiting from illegal tax exemptions.  Cf. *Havens Realty Corp.* v. *Coleman*, 455 U. S., at 377 (injury from racial steering practices confined to "relatively compact neighborhood[s]").  Thus, the Court's "parade of horribles" concerning black plaintiffs from Hawaii challenging tax

that the IRS's grant of tax-exempt status to racially discriminatory private schools directly injures their children's opportunity and ability to receive a desegregated education. As the complaint specifically alleges, the IRS action being challenged

> "fosters and encourages the organization, operation and expansion of institutions providing racially segregated educational opportunities for white children avoiding attendance in desegregating public school districts and thereby interferes with the efforts of federal courts, HEW and local school authorities to desegregate public school districts which have been operating racially dual school systems." Complaint ¶ 50(b), App. 39.

The Court acknowledges that this alleged injury is sufficient to satisfy constitutional standards. See *ante,* at 756. It does so only grudgingly, however, without emphasizing the significance of the harm alleged. Nonetheless, we have consistently recognized throughout the last 30 years that the deprivation of a child's right to receive an education in a desegregated school is a harm of special significance; surely, it satisfies any constitutional requirement of injury in fact. Just last Term in *Bob Jones University* v. *United States,* for example, we acknowledged that "[a]n unbroken line of cases following *Brown* v. *Board of Education* establishes beyond doubt this Court's view that racial discrimination in education violates a most fundamental national public policy, *as well as rights of individuals.*" 461 U. S., at 593 (1983) (emphasis added). See *Gilmore* v. *City of Montgomery,* 417 U. S. 556, 568 (1974) ("[T]he constitutional rights of children not to be discriminated against . . . can neither be nullified openly and

---

exemptions granted to schools in Maine, see *ante,* at 756, is completely irrelevant for purposes of Art. III standing in this action. Indeed, even if relevant, that criticism would go to the scope of the class certified or the relief granted in the lawsuit, issues that were not reached by the District Court or the Court of Appeals and are not now before this Court.

directly . . ., nor nullified indirectly . . . through evasive schemes for segregation whether attempted 'ingeniously or ingenuously'") (quoting *Cooper* v. *Aaron,* 358 U. S. 1, 17 (1958)); *Norwood* v. *Harrison,* 413 U. S. 455, 468–469 (1973). "The right of a student not to be segregated on racial grounds in schools . . . is indeed so fundamental and pervasive that it is embraced in the concept of due process of law." *Cooper* v. *Aaron, supra,* at 19; *Brown* v. *Board of Education,* 347 U. S. 483 (1954).

In the analogous context of housing discrimination, the Court has similarly recognized that the denial of an opportunity to live in an integrated community is injury sufficient to satisfy the constitutional requirements of standing.   In particular, we have recognized that injury is properly alleged when plaintiffs claim a deprivation "of the social and professional benefits of living in an integrated society."   *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 111–112 (1979).   See also *Havens Realty Corp.* v. *Coleman, supra,* at 376, and n. 17; *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S. 205 (1972).   Noting "the importance of the 'benefits [obtained] from interracial associations,'" as well as the oft-stated principle "that noneconomic injuries may suffice to provide standing," we have consistently concluded that such an injury is "sufficient to satisfy the constitutional standing requirement of actual or threatened harm."   *Gladstone, Realtors, supra,* at 112 (quoting *Trafficante, supra,* at 210, and citing *Sierra Club* v. *Morton,* 405 U. S. 727, 734–735 (1972)).

There is, of course, no rational basis on which to treat children who seek to be educated in desegregated school districts any differently for purposes of standing than residents who seek to live in integrated housing communities.   Indeed, if anything, discriminatory practices by private schools, which "exer[t] a pervasive influence on the entire educational process," *Norwood, supra,* at 469 (citing *Brown* v. *Board of Education, supra,* and quoted in *Bob Jones University, supra,* at

595), have been more readily recognized to constitute injury redressable in the federal courts. It is therefore beyond peradventure that the denial of the benefits of an integrated education alleged by the respondents in these cases constitutes "distinct and palpable injury."

B

Fully explicating the injury alleged helps to explain why it is fairly traceable to the governmental conduct challenged by the respondents. As the respondents specifically allege in their complaint:

"Defendants have fostered and encouraged the development, operation and expansion of many of these racially segregated private schools by recognizing them as 'charitable' organizations described in Section 501(c)(3) of the Internal Revenue Code, and exempt from federal income taxation under Section 501(a) of the Code. Once the schools are classified as tax-exempt . . ., contributions made to them are deductible from gross income on individual and corporate income tax returns. . . . Moreover, [the] organizations . . . are also exempt from federal social security taxes . . . and from federal unemployment taxes . . . . The resulting exemptions and deductions provide tangible financial aid and other benefits which support the operation of racially segregated private schools. In particular, the resulting deductions facilitate the raising of funds to organize new schools and expand existing schools in order to accommodate white students avoiding attendance in desegregating public school districts. Additionally, the existence of a federal tax exemption amounts to a federal stamp of approval which facilitates fund raising on behalf of racially segregated private schools. Finally, by supporting the development, operation and expansion of institutions providing racially segregated educational opportunites

for white children avoiding attendance in desegregating public schools, defendants are thereby interfering with the efforts of courts, HEW and local school authorities to desegregate public school districts which have been operating racially dual school systems." Complaint ¶ 21, App. 24.[4]

Viewed in light of the injuries they claim, the respondents have alleged a direct causal relationship between the Government action they challenge and the injury they suffer: their inability to receive an education in a racially integrated school is directly and adversely affected by the tax-exempt status granted by the IRS to racially discriminatory schools in their respective school districts. Common sense alone would recognize that the elimination of tax-exempt status for racially discriminatory private schools would serve to lessen the impact that those institutions have in defeating efforts to desegregate the public schools.

The Court admits that "[t]he diminished ability of respondents' children to receive a desegregated education would be

---

[4] The substance of these allegations is also summarized in ¶ 2 of the complaint:

"Contrary to law and their public responsibility, defendants have fostered and encouraged the development, operation and expansion of these racially segregated private schools by granting them, or the organizations that operate them, exemptions from federal income taxation . . . . Defendants have thereby ensured that these private schools will be exempt from federal income taxation, and that contributions to them will be deductible by corporate and individual donors for federal tax purposes. These federal tax benefits are important to the financial well-being of private segregated schools and significantly support their development, operation and expansion. Moreover, by facilitating the development, operation and expansion of racially segregated schools which provide alternative educational opportunities for white children avoiding attendance in desegregating public school systems, defendants are thereby interfering with the efforts of federal courts, HEW and local school authorities to desegregate public school districts which have operated racially dual school systems." App. 17–18.

fairly traceable to unlawful IRS grants of tax exemptions . . . if there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration," but concludes that "[r]espondents have made no such allegation." *Ante*, at 758. With all due respect, the Court has either misread the complaint or is improperly requiring the respondents to prove their case on the merits in order to defeat a motion to dismiss.[5] For example, the respondents specifically refer by name to at least 32 private schools that discriminate on the basis of race and yet continue to benefit illegally from tax-exempt status. Eighteen of those schools—including at least 14 elementary schools, 2 junior high schools, and 1 high school—are located in the city of Memphis, Tenn., which has been the subject of several court orders to desegregate. See Complaint ¶¶ 24–27, 45, App. 26–27, 35–36. Similarly, the respondents cite two private schools in Orangeburg, S. C. that continue to benefit from federal tax exemptions even though they practice race discrimination in school districts that are desegregating pursuant to judicial and administrative orders. See Complaint ¶¶ 29, 46, App. 28, 36. At least with respect to these school districts, as well as the others specifically mentioned in the complaint, there can be little doubt that the respondents have identified communities containing "enough racially discriminatory private schools receiving tax exemptions . . . to make an appreciable difference in public school integration," *ante*, at 758.[6]

---

[5] The Court's confusion is evident from note 23 of its opinion, *ante*, at 758. The Court claims that "none of [the schools] alleged to be directly receiving a tax exemption is alleged to be racially discriminatory." This is directly contradicted not only by the plain language of the complaint, see Complaint ¶¶ 2, 22, App. 17–18, 25, but also by the Court's earlier concession that the respondents' complaint alleges "grants of tax-exempt status to . . . racially discriminatory private schools in desegregating districts," *ante*, at 745, n. 11.

[6] Even if the Court were correct in its conclusion that there is an insufficient factual basis alleged in the complaint, the proper disposition would be

Moreover, the Court has previously recognized the existence, and constitutional significance, of such direct relationships between unlawfully segregated school districts and government support for racially discriminatory private schools in those districts. In *Norwood* v. *Harrison*, 413 U. S. 455 (1973), for example, we considered a Mississippi program that provided textbooks to students attending both public and private schools, without regard to whether any participating school had racially discriminatory policies. In declaring that program constitutionally invalid, we noted that "'a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.'" *Id.*, at 465. We then spoke directly to the causal relationship between the financial aid provided by the state textbook program and the constitutional rights asserted by the students and their parents:

> "The District Court laid great stress on the absence of a showing by appellants that 'any child enrolled in private school, if deprived of free textbooks, would withdraw from private school and subsequently enroll in the public schools.' . . . *We do not agree with the District Court in its analysis of the legal consequences of this uncertainty, for the Constitution does not permit the State to aid discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school. A State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination.*" *Id.*, at 465–466 (citations omitted) (emphasis added).

to remand in order to afford the respondents an opportunity to amend their complaint. See *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 377–378 (1982); *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S. 26, 55, n. 6 (1976) (BRENNAN, J., concurring in judgment). Cf. Fed. Rule Civ. Proc. 12(e).

Thus, *Norwood* explicitly stands for the proposition that governmental aid to racially discriminatory schools is a direct impediment to school desegregation.

The Court purports to distinguish *Norwood* from the present litigation because " '[t]he plaintiffs in *Norwood* were parties to a school desegregation order' " and therefore "had acquired a right to have the State 'steer clear' of any perpetuation of the racially dual school system that it had once sponsored," *ante,* at 763 (quoting *Gilmore* v. *City of Montgomery,* 417 U. S., at 571, n. 10, and *Norwood, supra,* at 467), whereas the "[r]espondents in this lawsuit . . . have no injunctive rights against the IRS that are allegedly being harmed," *ante,* at 763.  There is nothing to suggest, however, that the relevant injunction in *Norwood* was anything more than an order to desegregate the schools in Tunica County, Miss.[7]  Given that many of the school districts identified in the respondents' complaint have also been the subject of court-ordered integration, the standing inquiry in these cases should not differ.  And, although the respondents do not specifically allege that they are named parties to

---

[7] In particular, the plaintiffs in *Norwood,* suing on behalf of a statewide class of black students, characterized the basis for their standing as follows:

"The named plaintiffs . . . are black citizens of the United States residing in Tunica County, Mississippi.  They are students in attendance at the public schools of the Tunica County School District.  Their right to a racially integrated and otherwise nondiscriminatory public school system, vindicated by order of [the District Court] dated January 23, 1970 [*United States and Driver* v. *Tunica County School District,* Civil Action Nos. DC 6718 and 7013], and their right to the elimination of state support for racially segregated schools, has been frustrated and/or abridged by the creation of the racially segregated Tunica County Institute of Learning and the policies and practices of defendants as set forth below."  App. 20 and Brief for United States as *Amicus Curiae* in *Norwood* v. *Harrison,* O. T. 1972, No. 72–77, p. 5.

For the reasons explained in the text, I find these allegations legally indistinguishable from the allegations in the present litigation.

any outstanding desegregation orders, that is undoubtedly due to the passage of time since the orders were issued, and not to any difference in the harm they suffer.

Even accepting the relevance of the Court's distinction, moreover, that distinction goes to the injury suffered by the respective plaintiffs, and not to the causal connection between the harm alleged and the governmental action challenged. Cf. *ante*, at 756 (conceding that the respondents have alleged constitutionally sufficient harm in these cases). The causal relationship existing in *Norwood* between the alleged harm (*i. e.*, interference with the plaintiffs' injunctive rights to a desegregated school system) and the challenged governmental action (*i. e.*, free textbooks provided to racially discriminatory schools) is indistinguishable from the causal relationship existing in the present cases, unless the Court intends to distinguish the lending of textbooks from the granting of tax-exempt status. The Court's express statement on causation in *Norwood* therefore bears repeating: "the Constitution does not permit the State to aid discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school." 413 U. S., at 465–466. See Note, The Judicial Role in Attacking Racial Discrimination in Tax-Exempt Private Schools, 93 Harv. L. Rev. 378, 385–386 (1979).[8]

---

[8] Our subsequent decision in *Gilmore* v. *City of Montgomery*, 417 U. S. 556 (1974), heavily relied on our decision in *Norwood*. In *Gilmore*, we considered a challenge to a city policy that permitted racially segregated schools and other segregated private groups and clubs to use city parks and recreational facilities. In affirming an injunction against exclusive access to such facilities, we noted:

"Any arrangement, implemented by state officials at any level, which significantly tends to perpetuate a dual school system, in whatever manner, is constitutionally impermissible. '[T]he constitutional rights of children not to be discriminated against . . . can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted "ingeniously or ingenuously." ' This means that any tangible

Similarly, although entitled to less weight than a decision after full briefing and oral argument on the merits, see *Tully* v. *Griffin, Inc.*, 429 U. S. 68, 74 (1976), our summary affirmance in *Coit* v. *Green*, 404 U. S. 997 (1971), summarily aff'g *Green* v. *Connally*, 330 F. Supp. 1150 (DC), is directly relevant to the standing of the respondents in this litigation. The plaintiffs in *Coit* v. *Green* were black parents of minor children attending public schools in desegregating school districts. Like the respondents in these cases, the plaintiffs charged that the IRS had failed to confine tax-exempt status to private schools that were not racially discriminatory. And like the present respondents, they sought new IRS procedures as their exclusive remedy.

The three-judge District Court expressly concluded that the plaintiffs had standing to maintain their action:

> "This case is properly maintained as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, by Negro school children in Mississippi and the parents of those children on behalf of themselves and all persons similarly situated. They have standing to attack the constitutionality of statutory provisions which they claim provid[e] an unconstitutional system of benefits and

state assistance, outside the generalized services government might provide to private segregated schools in common with other schools, and with all citizens, is constitutionally prohibited if it has 'a significant tendency to facilitate, reinforce, and support private discrimination.' The constitutional obligation of the State 'requires it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination.'" 417 U. S., at 568–569 (citations omitted).

The Court notes that the case in *Gilmore* was remanded to the District Court for development of a more particularized record to ensure that the nonexclusive use of the city's parks "'would result in cognizable injury to these plaintiffs.'" *Ante*, at 763, n. 28 (quoting *Gilmore, supra,* at 570–571, n. 10). At most, however, this simply suggests that a remand for more particularized pleadings is the proper disposition in the present litigation. Cf. n. 6, *supra*. The Court is therefore no more faithful to the procedures followed in *Gilmore* than it is to the substance of that decision.

matching grants that fosters and supports a system of segregated private schools as an alternative available to white students seeking to avoid desegregated public schools. We follow the precedent on this point of the three-judge District Court for the Southern District of Mississippi in Coffey v. State Educational Finance Commission, 296 F. Supp. 1389 (1969)." *Green* v. *Kennedy*, 309 F. Supp. 1127, 1132 (DC), appeal dism'd *sub nom. Cannon* v. *Green*, 398 U. S. 956 (1970).

When the case was properly appealed to this Court, the standing issue was expressly raised in the jurisdictional statement filed by intervenor Coit, on behalf of a class of parents and children who supported or attended all-white private schools. Juris. Statement, O. T. 1971, No. 71–425, p. 11. See *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S., at 63, and n. 11 (BRENNAN, J., concurring in judgment). Nonetheless, the Court summarily affirmed, *Coit* v. *Green, supra,* thereby indicating our agreement with the District Court's conclusion.[9] See also *Griffin* v. *County*

---

[9] The Court's discussion of our summary affirmance in *Coit* v. *Green* simply stretches the imagination beyond its breaking point. The Court concludes that "[t]he limited setting, the history of school desegregation in Mississippi at the time of the *Coit* litigation, the nature of the IRS conduct challenged at the outset of the litigation, and the District Court's particular findings . . . amply distinguish the *Coit* case from respondents' lawsuit." *Ante,* at 765. With all due respect, none of these criteria should be relevant to the determination of standing in these cases.

First, although the *Coit* litigation was limited to the State of Mississippi, that relates solely to the scope of a properly certified class, and not to the standing of class members to maintain their action. Cf. n. 3, *supra.* Second, although the District Court made extensive findings concerning the importance of tax exemptions to the discriminatory schools involved in the *Coit* litigation, that only helps to prove the truth of the allegations made by the respondents in these cases. It also demonstrates why the respondents should be given either an opportunity to prove their case on the merits or an opportunity to amend their pleadings with more particularized allegations. Cf. nn. 6, 8, *supra.* Because the respondents in this litigation have never had their day in court, the Court's use of the specific findings

*School Board of Prince Edward County*, 377 U. S. 218, 224 (1964).

Given these precedents, the Court is forced to place primary reliance on our decision in *Simon* v. *Eastern Kentucky Welfare Rights Org.*, *supra*. In that case, the Court denied standing to plaintiffs who challenged an IRS Revenue Ruling that granted charitable status to hospitals even though they failed to operate to the extent of their financial ability when refusing medical services for indigent patients. The Court found that the injury alleged was not one "that fairly can be traced to the challenged action of the defendant." *Id.*, at 41. In particular, it was "purely speculative" whether the denial of access to hospital services alleged by the plaintiffs fairly could be traced to the Government's grant of tax-exempt status to the relevant hospitals, primarily because the hospitals were likely making their service decisions without regard to the tax implications. *Id.*, at 42–43.

Even accepting the correctness of the causation analysis included in that decision, however, it is plainly distinguishable from the cases at hand. The respondents in these cases do not challenge the denial of any service by a tax-exempt

made in the *Coit* litigation to deny the respondents standing in this litigation makes a mockery of the standing inquiry. Third, although it is correct that, before the *Coit* litigation, the IRS initially followed a policy of granting tax exemptions to racially discriminatory schools, that should have no bearing on the respondents' standing in these cases; indeed, the respondents have alleged that the current IRS enforcement policy is so ineffective as to be the functional equivalent of the Government's policy prior to the *Coit* litigation. See *supra*, at 768, and n. 2. Finally, if the "history of school desegregation in Mississippi at the time of the *Coit* litigation" is at all relevant to the standing inquiry, it weighs in favor of allowing the respondents to maintain their present lawsuit. From the perspective of black children attending desegregating public schools, and according to the allegations included in their complaint, current IRS policies toward racially discriminatory private schools represent a substantial continuation of the onerous history of school desegregation in the affected school districts. With all respect, therefore, the Court has simply failed to distinguish these cases from our summary affirmance in *Coit* v. *Green*.

institution; admittedly, they do not seek access to racially discriminatory private schools. Rather, the injury they allege, and the injury that clearly satisfies constitutional requirements, is the deprivation of their children's opportunity and ability to receive an education in a racially integrated school district. See *supra,* at 770–773. This injury, as the Court admits, *ante,* at 757–758, and as we have previously held in *Norwood* v. *Harrison,* 413 U. S., at 465–466, is of a kind that is directly traceable to the governmental action being challenged. The relationship between the harm alleged and the governmental action cannot simply be deemed "purely speculative," as was the causal connection at issue in *Simon* v. *Eastern Kentucky Welfare Rights Org., supra,* at 42. Indeed, as I have previously explained, *supra,* at 773–778, the Court's conclusion to the contrary is based on a unjustifiably narrow reading of the respondents' complaint and an indefensibly limited interpretation of our holding in *Norwood.* By interposing its own version of pleading formalities between the respondents and the federal courts, the Court not only has denied access to litigants who properly seek vindication of their constitutional rights, but also has ignored the important historical role that the courts have played in the Nation's efforts to eliminate racial discrimination from our schools.

### III

More than one commentator has noted that the causation component of the Court's standing inquiry is no more than a poor disguise for the Court's view of the merits of the underlying claims.[10] The Court today does nothing to avoid that criticism. What is most disturbing about today's decision, therefore, is not the standing analysis applied, but the in-

---

[10] See, *e. g.,* L. Tribe, American Constitutional Law § 3–21 (1978); Chayes, Foreword: Public Law Litigation and the Burger Court, 96 Harv. L. Rev. 1, 14–22 (1982); Nichol, Causation as a Standing Requirement: The Unprincipled Use of Judicial Restraint, 69 Ky. L. J. 185 (1980–1981); Tushnet, The New Law of Standing: A Plea for Abandonment, 62 Cornell L. Rev. 663 (1977).

difference evidenced by the Court to the detrimental effects that racially segregated schools, supported by tax-exempt status from the Federal Government, have on the respondents' attempt to obtain an education in a racially integrated school system. I cannot join such indifference, and would give the respondents a chance to prove their case on the merits.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

Three propositions are clear to me: (1) respondents have adequately alleged "injury in fact"; (2) their injury is fairly traceable to the conduct that they claim to be unlawful; and (3) the "separation of powers" principle does not create a jurisdictional obstacle to the consideration of the merits of their claim.

I

Respondents, the parents of black schoolchildren, have alleged that their children are unable to attend fully desegregated schools because large numbers of white children in the areas in which respondents reside attend private schools which do not admit minority children. The Court, JUSTICE BRENNAN, and I all agree that this is an adequate allegation of "injury in fact." The Court is quite correct when it writes:

> "The injury they identify—their children's diminished ability to receive an education in a racially integrated school—is, beyond any doubt, not only judicially cognizable but, as shown by cases from *Brown* v. *Board of Education*, 347 U. S. 483 (1954), to *Bob Jones University* v. *United States*, 461 U. S. 574 (1983), one of the most serious injuries recognized in our legal system." *Ante*, at 756.

This kind of injury may be actionable whether it is caused by the exclusion of black children from public schools or by an official policy of encouraging white children to attend nonpub-

lic schools. A subsidy for the withdrawal of a white child can have the same effect as a penalty for admitting a black child.

## II

In final analysis, the wrong respondents allege that the Government has committed is to subsidize the exodus of white children from schools that would otherwise be racially integrated. The critical question in these cases, therefore, is whether respondents have alleged that the Government has created that kind of subsidy.

In answering that question, we must of course assume that respondents can prove what they have alleged. Furthermore, at this stage of the litigation we must put to one side all questions about the appropriateness of a nationwide class action.[1] The controlling issue is whether the causal connection between the injury and the wrong has been adequately alleged.

An organization that qualifies for preferential treatment under § 501(c)(3) of the Internal Revenue Code, because it is "operated exclusively for . . . charitable . . . purposes," 26

---

[1] The question whether respondents have adequately alleged their standing must be separated from the question whether they can prove what has been alleged. It may be that questions concerning the racial policies of given schools, and the impact of their tax treatment on enrollment, vary widely from school to school, making inappropriate the nationwide class described in respondents' complaint. A case in which it was proved that a segregated private school opened just as a nearby public school system began desegregating pursuant to court order, that the IRS knew the school did not admit blacks, and that the school prospered only as a result of favorable tax treatment, might be very different from one in which the plaintiff attempted to prove a nationwide policy and its effect. However, as JUSTICE BRENNAN observes, ante, at 770–771, n. 3, 780–781, n. 9, that goes to whether respondents can prove the nationwide policy they have alleged, and whether the factual issues they raise are sufficiently national in scope to justify the certification of a nationwide class. I rather doubt that a nationwide class would be appropriate, but at this stage respondents' allegations of injury must be taken as true, see Warth v. Seldin, 422 U. S. 490, 501 (1975), and hence we must assume that respondents can prove the existence of a nationwide policy and its alleged effects.

U. S. C. § 501(c)(3), is exempt from paying federal income taxes, and under § 170 of the Code, 26 U. S. C. § 170, persons who contribute to such organizations may deduct the amount of their contributions when calculating their taxable income. Only last Term we explained the effect of this preferential treatment:

> "Both tax exemptions and tax deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income. Deductible contributions are similar to cash grants of the amount of a portion of the individual's contributions." *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540, 544 (1983) (footnote omitted).

The purpose of this scheme, like the purpose of any subsidy, is to promote the activity subsidized; the statutes "seek to achieve the same basic goal of encouraging the development of certain organizations through the grant of tax benefits." *Bob Jones University* v. *United States*, 461 U. S. 574, 587, n. 10 (1983). If the granting of preferential tax treatment would "encourage" private segregated schools to conduct their "charitable" activities, it must follow that the withdrawal of the treatment would "discourage" them, and hence promote the process of desegregation.[2]

---

[2] Respondents' complaint is premised on precisely this theory. The complaint, in ¶¶ 39–48, describes a number of private schools which receive preferential tax treatment and which allegedly discriminate on the basis of race, providing white children with "a racially segregated alternative to attendance" in the public schools which respondents' children attend. The complaint then states:

"There are thousands of other racially segregated private schools which operate or serve desegregating public school districts and which function under the umbrella of organizations which have received, applied for, or will apply for, federal tax exemptions. Moreover, many additional public school districts will in the future begin desegregating pursuant to court order or [government] regulations and guidelines, under state law or vol-

We have held that when a subsidy makes a given activity more or less expensive, injury can be fairly traced to the subsidy for purposes of standing analysis because of the resulting increase or decrease in the ability to engage in the activity.[3]   Indeed, we have employed exactly this causation analysis in the same context at issue here—subsidies given private schools that practice racial discrimination.   Thus, in *Gilmore* v. *City of Montgomery*, 417 U. S. 556 (1974), we easily recognized the causal connection between official policies that enhanced the attractiveness of segregated schools and the failure to bring about or maintain a desegregated public school system.[4]   Similarly, in *Norwood* v. *Harrison*,

untarily.   Additional racially segregated private schools may be organized or expanded, many of which will be operated by organizations which have received, applied for, or will apply for federal tax exemptions.   As in the case of those representative organizations and private schools described in paragraphs 39–48, *supra*, such organizations and schools provide, or will provide, white children with a racially segregated alternative to desegregating public schools.   *By recognizing these organizations as exempt from federal taxation, defendants facilitate their development, operation and expansion and the provision of racially segregated educational opportunities for white children avoiding attendance in desegregating public school systems.   Defendants thereby also interfere with the efforts of federal courts, [the Federal Government] and local school authorities to eliminate racially dual school systems."*   App. 38 (emphasis supplied).

Thus, like JUSTICE BRENNAN, *ante*, at 774–775, I do not understand why the Court states that the complaint contains no allegation that the tax benefits received by private segregated schools "make an appreciable difference in public school integration," *ante*, at 758, unless the Court requires "intricacies of pleading that would have gladdened the heart of Baron Parke."   Chayes, The Role of the Judge in Public Law Litigation, 89 Harv. L. Rev. 1281, 1305 (1976).

[3] See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 74–78 (1978); *United States* v. *SCRAP*, 412 U. S. 669, 687–689 (1973); see also *Barlow* v. *Collins*, 397 U. S. 159 (1970).

[4] We agreed with the District Court's following reasoning:

"Montgomery officials were under an affirmative duty to bring about and to maintain a desegregated public school system.   Providing recreational facilities to *de facto* or *de jure* segregated private schools was inconsistent with that duty because such aid enhanced the attractiveness of those

413 U. S. 455 (1973), we concluded that the provision of textbooks to discriminatory private schools "has a significant tendency to facilitate, reinforce, and support private discrimination." *Id.*, at 466.

The Court itself appears to embrace this reading of *Gilmore* and *Norwood*. It describes *Gilmore* as holding that a city's policy of permitting segregated private schools to use public parks "would impede the integration of the public schools. Exclusive availability of the public parks 'significantly enhanced the attractiveness of segregated private schools . . . by enabling them to offer complete athletic programs.'" *Ante*, at 762, n. 27 (quoting 417 U. S., at 569). It characterizes *Norwood* as having concluded that the provision of textbooks to such schools would impede court-ordered desegregation. *Ante*, at 763. Although the form of the subsidy for segregated private schools involved in *Gilmore* and *Norwood* was different from the "cash grant" that flows from a tax exemption, the economic effect and causal connection between the subsidy and the impact on the complaining litigants was precisely the same in those cases as it is here.

---

schools, generated capital savings that could be used to improve their private educational offerings, and provided means to raise other revenue to support the institutions, all to the detriment of establishing the constitutionally mandated unitary public school system." 417 U. S., at 563. We went on to write:

"Any arrangement, implemented by state officials at any level, which significantly tends to perpetuate a dual school system, in whatever manner, is constitutionally impermissible. '[T]he constitutional rights of children not to be discriminated against . . . can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted "ingeniously or ingenuously."' This means that any tangible state assistance, outside the generalized services government might provide to private segregated schools in common with other schools, and with all citizens, is constitutionally prohibited if it has 'a significant tendency to facilitate, reinforce, and support private discrimination.'" *Id.*, at 568 (quoting *Cooper* v. *Aaron*, 358 U. S. 1, 17 (1958), and *Norwood* v. *Harrison*, 413 U. S. 455, 466 (1973)).

This causation analysis is nothing more than a restatement of elementary economics: when something becomes more expensive, less of it will be purchased. Sections 170 and 501(c)(3) are premised on that recognition. If racially discriminatory private schools lose the "cash grants" that flow from the operation of the statutes, the education they provide will become more expensive and hence less of their services will be purchased. Conversely, maintenance of these tax benefits makes an education in segregated private schools relatively more attractive, by decreasing its cost. Accordingly, without tax-exempt status, private schools will either not be competitive in terms of cost, or have to change their admissions policies, hence reducing their competitiveness for parents seeking "a racially segregated alternative" to public schools, which is what respondents have alleged many white parents in desegregating school districts seek.[5] In either event the process of desegregation will be advanced in the same way that it was advanced in *Gilmore* and *Norwood*— the withdrawal of the subsidy for segregated schools means the incentive structure facing white parents who seek such schools for their children will be altered. Thus, the laws of economics, not to mention the laws of Congress embodied in §§ 170 and 501(c)(3), compel the conclusion that the injury respondents have alleged—the increased segregation of their children's schools because of the ready availability of private schools that admit whites only—will be redressed if these schools' operations are inhibited through the denial of preferential tax treatment.[6]

---

[5] It is this "racially segregated alternative" to public schools—the availability of schools that "receive tax exemptions merely on the basis of adopting and certifying—but not implementing—a policy of nondiscrimination," App. 17–18, which respondents allege white parents have found attractive, see *id.*, at 23–24, and which would either lose their cost advantage or their character as a segregated alternative if denied tax-exempt status because of their discriminatory admissions policies.

[6] This causation analysis explains the holding in the case on which the Court chiefly relies, *Simon v. Eastern Kentucky Welfare Rights Organiza-*

## III

Considerations of tax policy, economics, and pure logic all confirm the conclusion that respondents' injury in fact is fairly traceable to the Government's allegedly wrongful conduct. The Court therefore is forced to introduce the concept of "separation of powers" into its analysis. The Court writes that the separation of powers "explains why our cases preclude the conclusion" that respondents' injury is fairly traceable to the conduct they challenge. *Ante,* at 759.

The Court could mean one of three things by its invocation of the separation of powers. First, it could simply be expressing the idea that if the plaintiff lacks Art. III standing to bring a lawsuit, then there is no "case or controversy"

---

*tion,* 426 U. S. 26 (1976). There, the plaintiffs—indigent persons in need of free medical care—alleged that they were harmed by the Secretary of the Treasury's decision to permit hospitals to retain charitable status while offering a reduced level of free care. However, while here the source of the causal nexus is the price that white parents must pay to obtain a segregated education, which is inextricably intertwined with the school's tax status, in *Simon* the plaintiffs were seeking free care, which hospitals could decide not to provide for any number of reasons unrelated to their tax status. See *id.,* at 42–43, and n. 23. Moreover, in *Simon,* the hospitals had to spend money in order to obtain charitable status. Therefore, they had an economic incentive to forgo preferential treatment. As the Court observed:

"It is equally speculative whether the desired exercise of the Court's remedial powers in this suit would result in the availability to respondents of such services. So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services. . . . [C]onflicting evidence supports the commonsense proposition that the dependence upon special tax benefits may vary from hospital to hospital." *Id.,* at 43.

In contrast, the tax benefits private schools receive here involve no "financial drain" since the schools need not provide "uncompensated services" in order to obtain preferential tax treatment. Thus, the economic effect of the challenged tax treatment in these cases is not "speculative," as the Court concluded it was in *Simon.* Here the financial incentives run in only one direction.

within the meaning of Art. III and hence the matter is not within the area of responsibility assigned to the Judiciary by the Constitution. As we have written in the past, through the standing requirement "Art. III limit[s] the federal judicial power 'to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.'" *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982) (quoting *Flast* v. *Cohen*, 392 U. S. 83, 97 (1968)).[7] While there can be no quarrel with this proposition, in itself it provides no guidance for determining if the injury respondents have alleged is fairly traceable to the conduct they have challenged.

Second, the Court could be saying that it will require a more direct causal connection when it is troubled by the separation of powers implications of the case before it. That approach confuses the standing doctrine with the justiciability of the issues that respondents seek to raise. The purpose of the standing inquiry is to measure the plaintiff's stake in the outcome, not whether a court has the authority to provide it with the outcome it seeks:

> "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." *Warth* v. *Seldin*, 422 U. S. 490, 498–499 (1975) (emphasis in original) (quoting *Baker* v. *Carr*, 369 U. S. 186, 204 (1962)).[8]

---

[7] See also *Warth* v. *Seldin*, 422 U. S., at 498; *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S. 208, 222 (1974).

[8] See also *Los Angeles* v. *Lyons*, 461 U. S. 95, 101–102 (1983); *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S., at 72; *Simon* v. *Eastern Kentucky Welfare Rights Organization*, 426 U. S., at 38; *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S., at 220–221; *United States* v. *Richardson*, 418 U. S. 166, 179 (1974); *O'Shea*

Thus, the "'fundamental aspect of standing' is that it focuses primarily on the *party* seeking to get his complaint before the federal court rather than 'on the issues he wishes to have adjudicated,'" *United States* v. *Richardson,* 418 U. S. 166, 174 (1974) (emphasis in original) (quoting *Flast,* 392 U. S., at 99). The strength of the plaintiff's interest in the outcome has nothing to do with whether the relief it seeks would intrude upon the prerogatives of other branches of government; the possibility that the relief might be inappropriate does not lessen the plaintiff's stake in obtaining that relief. If a plaintiff presents a nonjusticiable issue, or seeks relief that a court may not award, then its complaint should be dismissed for those reasons, and not because the plaintiff lacks a stake in obtaining that relief and hence has no standing.[9] Imposing an undefined but clearly more rigorous standard for redressability for reasons unrelated to the causal nexus between the injury and the challenged conduct

v. *Littleton,* 414 U. S. 488, 493–494 (1974); *Roe* v. *Wade,* 410 U. S. 113, 123 (1973); *Sierra Club* v. *Morton,* 405 U. S. 727, 731–732 (1972); *Flast* v. *Cohen,* 392 U. S. 83, 99 (1968).

[9] The *Flast* Court made precisely this point:

"When the emphasis in the standing problem is placed on whether the person invoking a federal court's jurisdiction is a proper party to maintain the action, the weakness of the Government's argument in this case becomes apparent. *The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government.* Such problems arise, if at all, only from the substantive issues the individual seeks to have adjudicated. Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. It is for that reason that the emphasis in standing problems is on whether the party invoking federal court jurisdiction has 'a personal stake in the outcome of the controversy,' and whether the dispute touches upon 'the legal relations of parties having adverse legal interests.'" *Id.,* at 100–101 (emphasis supplied) (citations omitted) (quoting *Baker* v. *Carr,* 369 U. S. 186, 204 (1962), and *Aetna Life Insurance Co.* v. *Haworth,* 300 U. S. 227, 240–241 (1937)).

can only encourage undisciplined, ad hoc litigation, a result that would be avoided if the Court straightforwardly considered the justiciability of the issues respondents seek to raise, rather than using those issues to obfuscate standing analysis.[10]

Third, the Court could be saying that it will not treat as legally cognizable injuries that stem from an administrative decision concerning how enforcement resources will be allocated. This surely is an important point. Respondents do seek to restructure the IRS's mechanisms for enforcing the legal requirement that discriminatory institutions not receive tax-exempt status. Such restructuring would dramatically

---

[10] The danger of the Court's approach is illustrated by its failure to provide any standards to guide courts in determining when it is appropriate to require a more rigorous redressability showing because of separation of powers concerns, or how redressability can be demonstrated in a case raising separation of power concerns. The only guidance the Court offers is that the separation of powers counsels against recognizing standing when the plaintiff "seek[s] a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties." *Ante*, at 761. That cannot be an appropriate test; the separation of powers tolerates quite a bit of "restructuring" in order to eliminate the effects of racial segregation. For example, in *Bolling* v. *Sharpe*, 347 U. S. 497 (1954), we held that the Fifth Amendment prohibits the Executive from maintaining a dual school system. We have subsequently made it clear that the courts have authority to restructure both school attendance patterns and curriculum when necessary to eliminate the effects of a dual school system. See, *e. g.*, *Columbus Board of Education* v. *Penick*, 443 U. S. 449 (1979); *Milliken* v. *Bradley*, 433 U. S. 267 (1977); *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1 (1971). At the same time, standing doctrine has never stood as a barrier to such "restructuring." In the seminal case of *Baker* v. *Carr*, 369 U. S. 186 (1962), the Court accorded voters standing to challenge population variations between electoral districts despite the fact that the legislative reapportionment sought would and eventually did have dramatic "restructuring" effects. Only two Terms ago, in *Watt* v. *Energy Action Educational Foundation*, 454 U. S. 151, 160–162 (1981), the Court accorded California standing to challenge the Secretary of the Interior's methods for accepting bids on oil and gas rights, despite the fact that this would affect the manner in which the Executive Branch discharged "[its] duty to 'take Care that the Laws are faithfully executed,'" *ante*, at 761.

affect the way in which the IRS exercises its prosecutorial discretion. The Executive requires latitude to decide how best to enforce the law, and in general the Court may well be correct that the exercise of that discretion, especially in the tax context, is unchallengeable.

However, as the Court also recognizes, this principle does not apply when suit is brought "to enforce specific legal obligations whose violation works a direct harm," *ante,* at 761. For example, despite the fact that they were challenging the methods used by the Executive to enforce the law, citizens were accorded standing to challenge a pattern of police misconduct that violated the constitutional constraints on law enforcement activities in *Allee* v. *Medrano,* 416 U. S. 802 (1974).[11] Here, respondents contend that the IRS is violating a specific constitutional limitation on its enforcement discretion. There is a solid basis for that contention. In *Norwood,* we wrote:

> "A State's constitutional obligation requires it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial or other invidious discrimination." 413 U. S., at 467.

*Gilmore* echoed this theme:

> "[A]ny tangible State assistance, outside the generalized services government might provide to private segregated schools in common with other schools, and with all citizens, is constitutionally prohibited if it has 'a significant tendency to facilitate, reinforce, and support private discrimination.' *Norwood* v. *Harrison,* 413 U. S. 455, 466 (1973). The constitutional obligation of the State 'requires it to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial

---

[11] See also *INS* v. *Delgado,* 466 U. S. 210, 217, n. 4 (1984).

or other invidious discrimination.' *Id.*, at 467." 417 U. S., at 568–569.

Respondents contend that these cases limit the enforcement discretion enjoyed by the IRS. They establish, respondents argue, that the IRS cannot provide "cash grants" to discriminatory schools through preferential tax treatment without running afoul of a constitutional duty to refrain from "giving significant aid" to these institutions. Similarly, respondents claim that the Internal Revenue Code itself, as construed in *Bob Jones*, constrains enforcement discretion.[12] It has been clear since *Marbury* v. *Madison*, 1 Cranch 137 (1803), that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Id.*, at 177. Deciding whether the Treasury has violated a specific legal

---

[12] In *Bob Jones* we clearly indicated that the Internal Revenue Code not only permits but in fact requires the denial of tax-exempt status to racially discriminatory private schools:

"Few social or political issues in our history have been more vigorously debated and more extensively ventilated than the issue of racial discrimination, particularly in education. Given the stress and anguish of the history of efforts to escape from the shackles of the 'separate but equal' doctrine of *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), it cannot be said that educational institutions that, for whatever reasons, practice racial discrimination, are institutions exercising 'beneficial and stabilizing influences in community life,' *Walz* v. *Tax Comm'n*, 397 U. S. 664, 673 (1970), or should be encouraged by having all taxpayers share in their support by way of special tax status.

"There can thus be no question that the interpretation of § 170 and § 501(c)(3) announced by the IRS in 1970 was correct. That it may be seen as belated does not undermine its soundness. It would be wholly incompatible with the concepts underlying tax exemption to grant the benefit of tax-exempt status to racially discriminatory educational entities, which 'exer[t] a pervasive influence on the entire educational process.' *Norwood* v. *Harrison*, [413 U. S.], at 469. Whatever may be the rationale for such private schools' policies, and however sincere the rationale may be, racial discrimination in education is contrary to public policy. Racially discriminatory educational institutions cannot be viewed as conferring a public benefit within the 'charitable' concept discussed earlier, or within the congressional intent underlying § 170 and § 501(c)(3)." 461 U. S., at 595–596.

limitation on its enforcement discretion does not intrude upon the prerogatives of the Executive, for in so deciding we are merely saying "what the law is." Surely the question whether the Constitution or the Code limits enforcement discretion is one within the Judiciary's competence, and I do not believe that the question whether the law, as enunciated in *Gilmore, Norwood,* and *Bob Jones,* imposes such an obligation upon the IRS is so insubstantial that respondents' attempt to raise it should be defeated for lack of subject-matter jurisdiction on the ground that it infringes the Executive's prerogatives.[13]

In short, I would deal with the question of the legal limitations on the IRS's enforcement discretion on its merits, rather than by making the untenable assumption that the granting of preferential tax treatment to segregated schools does not make those schools more attractive to white students and hence does not inhibit the process of desegregation. I respectfully dissent.

---

[13] It has long been the rule that unless a claim is wholly insubstantial, it may not be dismissed for lack of subject-matter jurisdiction. See *Bell* v. *Hood,* 327 U. S. 678 (1946).