**FOUNDATION ON ECONOMIC TRENDS, et al., Plaintiffs,**

v.

**Richard G. JOHNSON, et al., Defendants.**

Civ. A. No. 86–1956.

United States District Court, District of Columbia.

Dec. 22, 1986.

Edward Lee Rogers, Washington, D.C., for plaintiffs.

Pauline H. Milius, Elizabeth Ann Peterson, Ward Tabor, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This complaint seeks to have declared illegal and to enjoin operation of a Coordinated Framework for Regulation of Biotechnology ("Framework") issued by the Office of Science and Technology Policy on June 26, 1986, *see* 51 Fed.Reg. 23,302 (1986). Defendants have moved to dismiss the complaint and plaintiffs have moved for summary judgment. Each motion has been fully briefed and argued in open court. For the reasons set forth below, the complaint must be dismissed for lack of a justiciable case or controversy.

Plaintiff Foundation is a District of Columbia non-profit organization concerned, among other things, with the various implications of certain technological developments involving biochemical and genetic engineering which it sincerely believes may adversely affect the environment and ultimately human and animal health. It envisions release of certain unidentified novel and exotic microorganisms will result in a significant risk of such harm unless more knowledgeable and effective federal controls of new genetic techniques are instituted. The two individual plaintiffs have similar concerns.

The Framework was developed, after opportunity for comment, by an interagency group aided by scientific collaborators. The agencies included the National Science Foundation ("NSF"), Department of Agriculture, Occupational Safety and Health Administration ("OSHA"), Food and Drug Administration ("FDA"), National Institutes of Health ("NIH"), and the Environmental Protection Agency ("EPA"), who through their lead officials are named defendants along with certain other officials involved.

The Framework addresses the regulation of biotechnology research and products by the various defendant federal agencies having statutory authority to address risks potentially raised by introduction of new, genetically modified products into the environment. None of the relevant statutes apparently anticipated fully the introduction of the revolutionary processes of genetic engineering, such as recombinant DNA techniques, allowing direct manipulation of genetic material. Given a lack of specific legislative guidance, there has apparently been some confusion, controversy, indecision and delay in developing a coordinated approach to the regulatory issues that may arise. It was partly in recognition of this situation that an effort was made to create, in aid of communication, research project development and regulatory planning, the elaborate set of biotechnological definitions which is included in the Framework.

Since plaintiffs believe the definitions are incomplete and inexact, and thus will allow potentially dangerous genetically engineered products to be ignored or too casually regulated, they object, contending at the same time that the definitions have serious regulatory significance. Relying on isolated excerpts of the Framework plaintiffs assert that the definitions were injected into already existing regulations and made a mandatory part of subsequent regulations. They urge from this reading of the document that the Framework is defective for lack of notice and hearing, and in any case constitutes irrational agency action. Further, it is suggested the environmental risk posed by the Framework was so substantial that an environmental impact statement was required prior to its implementation.

Two paragraphs of the lengthy Framework's text are relied on to support this argument. It states:

It is the intention of the Domestic Policy Council Working Group on Biotechnology, the Biotechnology Science Coordinating Committee (BSCC), the Department of Agriculture (USDA), the Environmental Protection Agency (EPA), the Food and Drug Administration (FDA), the National Institutes of Health (NIH), the National Science Foundation (NSF), and the Occupational Safety and Health Administration (OSHA) that the policies contained herein be effective immediately.

51 Fed.Reg. 23,302 (1986). And later it states:

Given the statutory differences in the laws that they administer the agencies adopted the principles underlying the definitions in ways consistent with their legislation. EPA, APHIS, and S & E are using the definitions to identify levels of review for microbial products within their jurisdiction. EPA, APHIS, FDA, S & E, and NSF are using the definitions as factors to consider in the review of products or experiments.

*Id.* at 23,307.

These paragraphs, read in the context of the entire document, do not have the effect alleged. The Framework and definitions contained therein are set forth to guide policymaking, not to regulate. While the document is not a model of clarity, its treatment by the agencies involved conclusively establishes it is merely a first effort to aid in formulation of agency policy with respect to control of microorganisms developed by genetic engineering techniques.

Not only is the Framework still being examined, with further comments having been solicited, but its use by the agencies involved varies widely. NSF and NIH have not adopted the definitions as a matter of policy; Agriculture proposed to do so in one respect involving certain pesticides and asked for public comment but later changed its mind; FDA will limit its review only to those products falling within the Framework's definitions; and OSHA is still considering its policy. EPA has decided for the first time to implement review of genetically engineered products under the Toxic Substances Control Act, 15 U.S.C. §§ 2601 to 2629 (1982), by examining certain products falling within the Framework definitions. In its administration of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136 to 136y (1982), it continues to review releases of all genetically engineered pesticides—with those falling within the Framework definitions receiving greater scrutiny.

Although agencies are employing the Framework definitions in discussing and setting policy, the definitions do not alter existing regulations and no limitations have been imposed to govern the scope of any regulations that may be proposed by any agency in the future.

Thus the Court is forced to conclude that the complaint is defective. There was no regulatory rulemaking. Only an apparently far-from-successful effort to establish a common set of definitions in aid of a more coordinated discourse among interested agencies was involved, in an effort to coordinate research and greater awareness of product developments and related responsibilities. As far as regulation is concerned, each agency is on its own track and plaintiffs can assert their views, agency by agency, as regulatory proposals and decisions about specific uses of genetically engineered products seem to them to warrant. If, as suggested, the definitions do not include certain genetically engineered products of potential concern, there are no inhibitions upon plaintiffs to point this out in any future proceeding that incorporates a "deficient" definition.

■ Plaintiffs therefore have asked this Court to set aside the Framework based on abstract speculation about what the agencies involved may do in the future. They misconceive the role of the federal courts whose power is limited to adjudicating "cases" or "controversies". This requirement "defines with respect to the Judicial Branch the idea of separation of powers ... 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Allen v. Wright,*

468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). Plaintiffs must demonstrate this is a justiciable case or controversy by alleging clear injury deriving from the agencies' action, and showing that the dispute is ripe for adjudication. They have failed to do so.

■ Plaintiffs have standing to sue only if they allege that: 1) they have suffered distinct and palpable injury; which is 2) fairly traceable to defendants' actions; and 3) will likely be redressed by the relief they request. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Plaintiffs fail on all three requirements. Although environmental injury may serve as a basis for standing, *see, e.g., Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972), and plaintiffs have alleged a substantial interest in the integrity of the environment, plaintiffs' claim of injury is entirely speculative. They allege harm from future, unspecified agency actions that might present unreasonable risk to the environment. However, "[t]he injury requirement will not be satisfied simply because a chain of events can be hypothesized in which the action challenged eventually leads to actual injury." *Northwest Airlines, Inc. v. FAA,* 795 F.2d 195, 201 (D.C. Cir.1986). This Court has dealt with standing doctrine in an opinion filed today in another case involving genetic engineering issues, *Foundation on Economic Trends v. Thomas,* 661 F.Supp. 713, 717–718 (D.D.C.1986) developing why this type of injury is not judicially cognizable.

The second and third requirements, of causation and redressability, are not met because plaintiffs have not properly alleged any connection between the Framework and any future approval for use of genetically engineered products. The Framework definitions do not authorize agency action that could not otherwise take place, and there is no allegation that they will lead agencies to ignore their statutory duties to regulate in the public interest; indeed, the Framework itself is designed to further that interest. Conversely, invalidating these definitions would not limit in any way the existing power of the agencies to authorize uses of such products, after full review and the normal opportunity for input by concerned parties.

■ Even if plaintiffs had standing and the definitions had some legally relevant effect on the agencies' action, the dispute is not ripe for adjudication. Consideration of both "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration," *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), make this amply clear.

In this abstract factual setting, where no specific agency actions with an identifiable impact on the environment have been alleged, the Court can determine neither the probable effect of the Framework definitions nor their rationality. Because no specific injury has been alleged, there can be no showing of the "immediate and significant" hardship from deferral of adjudication, *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 (D.C.Cir.1986), that could support review of plaintiffs' claim at this juncture.

Defendant's motion will therefore be granted and the complaint dismissed for failure to present a justiciable case or controversy. An appropriate Order is filed herewith.