FOUNDATION ON ECONOMIC TRENDS, et al., Plaintiffs,

v.

Lee M. THOMAS, et al., Defendants.

Civ. A. No. 86–1590.

United States District Court, District of Columbia.

Dec. 22, 1986.

Edward Lee Rogers, Washington, D.C., for plaintiffs.

Carl Strass, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

Plaintiffs seek an order requiring the Environmental Protection Agency ("EPA") to modify the procedures under which it authorizes persons to release genetically engineered pesticides into the environment. They assert that EPA has erred in refusing to promulgate regulations requiring such persons to document their financial capability to redress and abate any potential harms that may result from such releases. Plaintiffs seek a ban on all releases until EPA has so acted. Defendants, who are various employees of EPA sued in their official capacity, have moved to dismiss or in the alternative for summary judgment. The issues have been fully briefed.

*Background*

Plaintiff Foundation on Economic Trends ("FOET"), of which plaintiff Jeremy Rifkin is president, is a private, non-profit organization which advocates limits on genetic engineering. Plaintiffs, invoking the Administrative Procedure Act ("APA"), 5 U.S.C. § 500–706 (1982), petitioned EPA for agency rulemaking on May 7, 1986 under the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 135 to 135k (1970), as amended by the Federal Environmental Pesticide Control Act of 1972 and the Federal Pesticide Act of 1978, 7 U.S.C. §§ 136 to 136y (1982 & Supp. III 1985) (collectively "FIFRA").

FIFRA requires pesticides to be registered by EPA. *See* 7 U.S.C. § 136a. To qualify for registration, in part, a pesticide must function as intended without causing "unreasonable adverse effects on the environment," 7 U.S.C. § 136a(c)(5)(C). "Un-

reasonable adverse effects" are those which impose "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). To obtain registration of a pesticide a company must furnish EPA with extensive data on the pesticide, *see* 7 U.S.C. § 136a(c)(1)(D).

In order to produce the required data preliminary field tests of the pesticide in the environment are often required. Before such tests are conducted on any substantial scale, the person applying is required to obtain an "experimental use permit" and demonstrate the experiment will generate registration data and will not cause unreasonable adverse effects. *See* 7 U.S.C. § 136c; 40 C.F.R. § 172.10(a) (1986). EPA exercises broad continuing supervision over experimental uses to ensure the public safety. *See, e.g.,* 7 U.S.C. § 136c(e); 40 C.F.R. §§ 172.5(c) & (d), 172.8(a), 172.-10(b) and 172.11(a) (1986).

Experimental use permits generally are not required for field tests involving less than ten acres of land. *See* 40 C.F.R. § 172.3 (1986). However, since 1984 EPA has required advance permission for release of genetically engineered microbial pesticides regardless of acreage affected, on the belief that because these pesticides can reproduce and spread beyond the application site, they may raise special testing concerns that need to be monitored. Before permitting experimental field use of such pesticides, EPA conducts a thorough review of the risks and benefits of the test, choosing on a case-by-case basis whether to grant or deny the application, impose special restrictions, or require additional data before action.[1]

By letter dated May 7, 1986 plaintiffs petitioned EPA to promulgate, through appropriate rulemaking procedures, regulations establishing "minimum financial responsibility standards" to be required from applicants for experimental use permits, and to establish equivalent standards for permanent registration of such pesticides.[2] Stating their concern with the agency's current procedures they urged that the risks posed by such releases, although still unquantified, are of potentially devastating proportions, and suggested that EPA "currently does not have an adequate program for assessing, controlling, and assuring remedial actions and accountability for the environmental risks presented by the deliberate releases of recombinant organisms."[3]

In support of their proposal, plaintiffs pointed out that "[t]he demonstration of financial responsibility has been required in other situations involving much more finite risks to man and the environment" such as activities posing danger to water quality or involving toxic wastes. They also noted that FIFRA requires EPA to balance the risks and benefits of pesticides to both man and the environment, and argued that "[t]o the extent that an applicant company cannot demonstrate adequate financial responsibility, then the public health and environment is exposed to a risk for which there will be no redress in the event of resulting harm." Plaintiffs concluded that proof of financial responsibility "must, as a matter of sound public policy, be required" and that under FIFRA the EPA "has the inherent authority to require evidence of financial responsibility and to establish appropriate standards therefor."[4]

EPA considered the petition and by letter dated June 2, 1986 indicated its rejection of it and its conclusion that there was no basis

1. *See* "Microbial Pesticides; Interim Policy on Small Scale Field Testing," 49 Fed.Reg. 40,659–61 (Oct. 17, 1984).

2. *See Petition,* at 2, reproduced in Appendix A to Complaint.

3. *Id.* at 3.

4. *Id.* at 6–7. Plaintiffs requested EPA to "immediately adopt an interim policy imposing interim requirements of evidence of financial responsibility on all pending applications" for experimental use permits and to initiate expeditious rulemaking procedures. By letter dated May 12, 1986 plaintiffs supplemented their petition with a request that EPA suspend evaluation of an experimental use permit filed by the University of California, whose insurance was due to expire on July 1, 1986. *See* Appendix A to Complaint.

for the proposed rulemaking.[5] EPA noted specifically that "without an explicit directive from Congress, we do not believe that as a general matter the Agency should become involved in the liability insurance aspects of pesticide use." After pointing out plaintiffs' recognition that Congress had expressly required financial responsibility standards in other areas of environmental concern,[6] EPA noted that "[n]o such provision is contained in FIFRA" and therefore it "must conclude that the administrative imposition of financial responsibility requirements would be beyond congressional intent under FIFRA."

EPA also explained that plaintiffs had provided no basis for imposing greater strictures on the release of genetically altered pesticides than on more conventional pesticides. It pointed out that the petition failed to provide a rationale for treating genetically altered pesticide products differently from others and asserted that although "the unique characteristics" of such products "may warrant a somewhat different review process, we are not aware of any evidence which demonstrates that organisms mutated through recombinant DNA techniques are, as a class, inherently riskier than organisms mutated through other techniques or than conventional chemical products." Plaintiffs have submitted no further evidence subsequent to EPA's response. They continue to press the argument that EPA has recognized a risk difference through its policy of requiring permits for *all* experimental releases of genetically altered materials.

*Standing*

■ Under the judicial review provision of the APA, 5 U.S.C. § 702 (1982), plaintiffs may sue if they are "adversely affected or aggrieved by agency action," which requires that they establish standing to sue under article III's case-or-controversy requirement and satisfy related prudential requirements. Thus plaintiffs must allege: 1) injury in fact; 2) which is "fairly tracea-

ble" to EPA's "allegedly unlawful conduct"; and 3) is "likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). *See also Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Prudentially they must overcome several general limits, against: 1) representation of the rights of third parties; 2) adjudication of "generalized grievances more appropriately addressed to the representative branches"; and 3) consideration of injuries which do not fall "within the zone of interests protected by the law invoked." *Allen, supra,* at 751, 104 S.Ct. at 3324.

In assessing the standing issue the Court must assume the truth of plaintiffs' allegations and construe the complaint in plaintiffs' favor. *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 1613, 60 L.Ed.2d 66 (1979); *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

The two plaintiffs assert separate injuries. FOET claims injury to its organizational activities. It is a private, non-profit organization actively involved, in part, with policy issues related to genetic engineering technology. It serves as a clearinghouse for public information on these issues, releases a variety of educational publications, participates in congressional hearings and in litigation, and has an active presence in the news media through its staff members. Its general message is that the hazards of genetic engineering are vastly underappreciated, and it has accordingly opposed on a variety of fronts the development of the technology. Complaint, ¶ 1. It claims EPA's failure to require applicants to provide information about their financial capacity to redress and abate possible harms arising from genetic releases, and particularly about their liability insurance coverage, hinders its educational and advocacy

5. *See* Appendix A to Complaint.

6. EPA cited as examples the Federal Water Pollution Control Act, 33 U.S.C. § 1321(p) (1982); the Resource Conservation and Recovery Act, 42 U.S.C. § 6924(t) (1982); and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9608 (1982).

functions by depriving it of information about who will bear the costs of redressing and abating any such harms. Complaint, ¶ 6. It does not claim standing as a representative of its members or staff.

■ Jeremy Rifkin, its president, alleges injury to his use and enjoyment of "the environmental resources of the United States, including (but not limited to) parks and other recreational lands." This enjoyment is substantially dependent, he claims, on "the ecological and genetic diversity and biological integrity of thousands of wild plants and animals ... and of many domesticated plants and animals, and the stability and viability of the biosphere which sustains them." EPA's refusal to promulgate financial responsibility standards, he asserts, threatens these environmental qualities by encouraging the deliberate release of novel, potentially hazardous organisms into the environment and failing to guarantee that any resulting harms will be redressed and abated. Complaint, ¶¶ 4–5. He also asserts EPA's failure to provide information on financial responsibility hampers his public role as an advocate on these issues. Complaint, ¶¶ 2, 6.

Addressing first the main standing claim of the individual plaintiff, it is clear that his allegations meet the causation and redressibility requirements. He alleges EPA's refusal to require financial responsibility standards injures his use and enjoyment of the environment by: (1) allowing the release of potentially dangerous pesticides that would not be released if such standards were instituted; and (2) failing to guarantee that releasers will compensate and rectify any harms from such releases. Both injuries flow directly from the EPA's position on the legal issue of whether such standards are required, and the relief requested would completely redress both injuries.

Thus the standing of the individual plaintiff turns on whether his asserted injury is judicially cognizable. The Supreme Court has recognized a wide variety of injuries that may satisfy the case-or-controversy requirement of article III, both economic and noneconomic.[7] It has indicated specifically that "[a]esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society," *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972), and recognized that injury to these interests may be judicially cognizable. *See id.* at 738–40, 92 S.Ct. at 1367–68. *United States v. SCRAP*, 412 U.S. 669, 686–90, 93 S.Ct. 2405, 2415–17, 37 L.Ed.2d 254 (1973).

Despite the breadth of the possible injuries that may be asserted in support of standing, litigants must possess more than a general interest in the values purportedly undermined by challenged actions. *See Sierra Club, supra*, 405 U.S. at 738–40, 92 S.Ct. at 1367–68. The Supreme Court "consistently has required ... that the party seeking judicial resolution of a dispute 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct' of the other party."[8] Article III requires the injury to be "distinct and palpable,"[9]—"not 'abstract' or 'conjectural' or 'hypothetical'."[10]

Under the closely related prudential policy against assertion of generalized grievances, "a litigant normally must assert an injury that is peculiar to himself or to a distinct group of which he is a part, rather than one 'shared in substantially equal measure by all or a large class of citizens.'" *Gladstone, supra*, 441 U.S. at 100, 99 S.Ct. at 1608. Both standards re-

---

**7.** *See generally* L. Tribe, *American Constitutional Law* § 3–16 (2d ed. 1987); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531.4 (1984). The vitality of early decisions entertaining noneconomic injuries was reaffirmed in *Valley Forge, supra*, 454 U.S. at 486, 102 S.Ct. at 766.

**8.** *Diamond v. Charles*, —— U.S. ——, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986) (quoting *Gladstone, supra*, 441 U.S. at 99, 99 S.Ct. at 766).

**9.** *Warth, supra*, 442 U.S. at 501, 95 S.Ct. at 2206.

**10.** *Allen, supra*, 468 U.S. at 751, 104 S.Ct. at 3325 (citations omitted). *See also Center for Auto Safety v. NHTSA*, 793 F.2d 1322, 1331 (D.C.Cir. 1986).

**718**

quire "concern about the proper—and properly limited—role of the courts in a democratic society" imposed by the constitutional separation of powers,[11] to prevent federal courts from becoming "no more than a vehicle for the vindication of the value interests of concerned bystanders."[12]

The injury alleged by the individual plaintiff is insufficient. Plaintiffs' allegations are wholly abstract, suggesting that absent relief from this Court releases of genetically engineered pesticides by financially irresponsible parties may occur. Nowhere in the complaint do plaintiffs suggest that any person currently desires to make releases in a financially irresponsible manner. Moreover, there is no allegation that *any* releases of whatever nature will occur in the future. Indeed, the only two recently proposed releases have apparently been permanently barred by court and agency action.[13] Presumably because no threatening releases have been identified, plaintiffs are unable to suggest with any specificity how any given release could cause noticeable, palpable harm to the national environment; whether any harm would occur to a part of the environment that the individual plaintiff regularly uses and enjoys, and the precise impact on him either economically or otherwise; and whether any proposed release would be allowed by EPA despite its careful review process.

The individual plaintiff has therefore alleged at most a hypothetical interest in changing an EPA policy that under conceivable circumstances might have detrimental effects. Such allegations are insufficient. This Circuit has recognized that "[t]he injury requirement will not be satisfied simply because a chain of events can be hypothesized in which the action challenged eventually leads to actual injury."[14] Where a party such as the individual plaintiff "relies wholly on the threat of future injury, the fact that the party (and the court) can 'imagine circumstances in which [the party] *could* be affected by the agency's action' is not enough."[15]

By contrast, the allegations of environmental injury judged adequate by the Supreme Court have been relatively limited in scope. In *Sierra Club*, the Court contemplated that users of a specific area of California wilderness could allege distinct and palpable injury from the proposed development plan at issue. *See* 405 U.S. at 753, 92 S.Ct. at 1375. *SCRAP*, although it involved an alleged injury that was "far less direct and perceptible," challenged a distinct action of an agency and alleged specific, perceptible and reasonably immediate harm to several aspects of the environment enjoyed by plaintiffs. *See* 412 U.S. at 688–89, 93 S.Ct. at 2416–17. The proposed standing theory, however, would allow any person to assert a generalized concern with EPA's regulatory activities, based on conjectural assumptions of undefined future actions by EPA and private parties and without challenging any given action or identifying any particular impact on the environment. This position is without support. The individual plaintiff's application for "a special license to roam the country in search of governmental wrongdoing and to reveal [his] discoveries in federal court"[16] must be rejected.

■ FOET's standing claim is also without merit. FOET has standing as an organization if it alleges sufficient injury to its activities. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982); *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975); *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931,

---

11. *Warth, supra,* 422 U.S. at 498, 95 S.Ct. at 2204; *see also Allen, supra,* 468 U.S. at 750, 752, 104 S.Ct. at 3325.

12. *SCRAP, supra,* 412 U.S. at 687, 93 S.Ct. at 2415.

13. *See* Plaintiff's Memorandum, at 4 n.*. This includes the experiment referred to in *supra* note 4.

14. *Northwest Airlines, Inc. v. FAA,* 795 F.2d 195, 201 (D.C.Cir.1986).

15. *Id.* (quoting *SCRAP, supra,* 412 U.S. at 688–89, 93 S.Ct. at 2416–17) (emphasis in original).

16. *Allen, supra,* 468 U.S. at 757, 104 S.Ct. at 3327.

937 (D.C.Cir.1986). The alleged injury to its informational and educational functions is insufficient because this interest is not "arguably within the zone of interests to be protected or regulated" by FIFRA.[17] *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). FIFRA was established to allow EPA to regulate pesticide use under carefully drawn requirements, and is not concerned with provision of safety information to the public at large.[18] For the same reason, this alleged informational interest cannot support the individual plaintiff's standing.

*Ripeness*

■ Even if plaintiffs had standing the case would not be justiciable because their claims are not ripe. In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), which remains the "leading discussion of the doctrine," [19] the Supreme Court explained that whether a claim is ripe depends on "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. The doctrine's "basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements," *id.* at 148, 87 S.Ct.

at 1515, concerning "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." [20] Based on the nature of the present challenge as described above, it is evident that judicial review at this stage would be wholly inappropriate; the dispute must be resolved, if at all, in a far more concrete factual setting.[21] Plaintiffs have not countered this conclusion by a showing "that delay in adjudication would cause unusual hardship" sufficient to warrant adjudication, such as "serious injury to important constitutionally protected interests," *Andrade v. Lauer,* 729 F.2d 1475, 1483 (D.C. Cir.1984).[22]

Defendants' motion will therefore be granted and the complaint dismissed for failure to present a justiciable case or controversy. An appropriate Order is filed herewith.

---

**17.** *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 153–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970).

**18.** Moreover, FOET's injury is not fairly traceable to EPA's refusal to promulgate financial responsibility standards. FOET is injured not by this refusal but by the failure, apparently, of EPA to require companies to disclose their exact level of financial responsibility. FOET would remain injured, presumably, if EPA provided the requested relief but failed to make the financial responsibility information available to the public; thus it is not clear the redressability requirement is met.

**19.** *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983).

**20.** 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3532, at 112 (1984). *See also Hotel & Restaurant Employees Union,*

*Local 25 v. Attorney General of the United States,* 804 F.2d 1256, 1265–66 (D.C.Cir.1986); *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 (D.C.Cir.1986).

**21.** *Cf. Rizzo v. Goode,* 423 U.S. 362, 372, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); *O'Shea v. Littleton,* 414 U.S. 488, 495–99, 94 S.Ct. 669, 675–78, 38 L.Ed.2d 674 (1974); *International Longshoremen's and Warehousemen's Union, Local 37 v. Boyd,* 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954); *United Public Workers of America v. Mitchell,* 330 U.S. 75, 89–90, 67 S.Ct. 556, 564–65, 91 L.Ed. 754 (1947).

**22.** *See also Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 (D.C.Cir.1986) ("[i]n order to outweigh institutional interests in the deferral of review, the hardship to those affected by the agency's action must be immediate and significant").